[Civ. No. 12220.  First Dist., Div. One.  Apr. 28, 1943.]

Estate of ANTONIO PESSAGNO, Deceased.  JOSEPH PESSAGNO, Respondent, v. HENRY A. PLEITNER, et al., Appellants.

Arthur Joel, Pierce & Sherwin, Marvin Sherwin and W. I. Follett for Appellants.

J. Paul St. Sure, Edward H. Moore and James R. Agee for Respondent.

PETERS, P. J.—Henry A. Pleitner, Andre Ghiotti and the Imperial Council of the Ancient Arabic Order of the Nobles of the Mystic Shrine for North America, legatees under the will of Antonio Pessagno, appeal from a judgment denying

probate to the latter's will based on a finding that "at the time of the signing of said purported will said Antonio Pessagno was not of sound and disposing mind and was not competent to dispose of his estate by will." On this appeal the proponents contend that there is not sufficient evidence to sustain the finding of lack of testamentary capacity.

In reviewing the sufficiency of the evidence in an action involving a will contest the test to be applied by the appellate court is the same that applies on other appeals, namely, whether or not there is any substantial evidence to support the trial court's determination of incapacity. In *Estate of Downey,* 51 Cal.App.2d 275, 285 [124 P.2d 637], the court quoted from *Estate of Ramey,* 62 Cal.App. 413, 425 [217 P. 135], as follows: "However, in will contests the rule is the same as in other proceedings, that all questions of the weight of the evidence and the credibility of the witnesses are for the jury and the trial court, and if there be any substantial evidence to support the finding or verdict it cannot be set aside by the reviewing court, although said court might believe the great preponderance of the evidence was the other way." (See, also, *Estate of Hansen,* 38 Cal.App.2d 99 [100 P.2d 776]; *Estate of Gill,* 14 Cal.App.2d 526 [58 P.2d 734]; *Estate of Miller,* 16 Cal.App.2d 141 [60 P.2d 492].)

As in other cases involving the sufficiency of the evidence to sustain a finding or verdict, "the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion" of the trier of the facts. (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]; see also, *Treadwell* v. *Nickel,* 194 Cal. 243 [228 P. 25]; *Bancroft-Whitney Co.* v. *McHugh,* 166 Cal. 140 [134 P. 1157]; *Wing* v. *Kishi,* 92 Cal.App. 495 [268 P. 483].)

The rule that must be applied by trial courts in determining, in the first instance, whether the testator has sufficient testamentary capacity to execute a valid will, and by the appellate courts in determining whether a finding of lack of testamentary capacity is supported by substantial evidence, is stated as follows in the frequently cited case of *Estate of Chevallier,* 159 Cal. 161, 168 [113 P. 130]: "In considering the evidence it is important, preliminarily, to observe that it

is not every form of insanity, not every mental departure from the normal, which destroys an otherwise valid testamentary act. The rule of law is not that no person who is insane may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld. Thus, the wills of aged and infirm people, of people sick in mind as well as in body, are always upheld, if, notwithstanding their enfeeblement, testamentary capacity is shown. So, again, it may be well and perhaps soundly reasoned that all persons who commit crime and that all persons who commit suicide are aberrant, abnormal, and therefore insane. But such is not the insanity which the law has in mind. It must be an insanity of one of two forms, either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion. And, even in the latter class of cases, it would not be sufficient merely to establish that a testator was the victim of some hallucination or delusion to avoid the will. The evidence must go further and establish that the will itself was the creature or product of such hallucination or delusion, or, in other words, that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument.'' (See, also, *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149]; *Estate of Bemmerly,* 110 Cal.App. 550 [294 P. 33]; *Estate of Casarotti,* 184 Cal. 73 [192 P. 1085]; *Estate of Purcell,* 164 Cal. 300 [128 P. 932]; *Estate of Sexton,* 199 Cal. 759 [251 P. 778]; *Estate of Arnold,* 16 Cal.2d 573 [107 P.2d 25].)

There are certain other rules that must be kept in mind in passing on the sufficiency of the evidence. The burden of proof to show lack of testamentary capacity is, of course, on the contestant. ■ It is well settled that a testator has sufficient mental capacity to execute a will if he has sufficient capacity to understand the nature of his act, the extent and character of his property, and the persons who are the natural objects of his bounty. (*Estate of Purcell,* 164 Cal. 300 [128 P. 932]; *Estate of Arnold,* 16 Cal.2d 573 [107 P.2d 25]; *Estate of Sexton,* 199 Cal. 759 [251 P. 778]; *Estate of Grant,* 8 Cal. App.2d 232 [47 P.2d 508]; *Estate of Garvey,* 38 Cal.App.2d 449 [101 P.2d 551].) ■ It is also well settled that the opinion

of a witness or of an expert that the testator was of unsound mind is of no greater value than the reasons given in support of the opinion. If the reasons given by such witnesses do not support the conclusion of lack of testamentary capacity, the opinion is entitled to no weight in either the trial or appellate courts. (*Estate of Nolan,* 25 Cal.App.2d 738 [78 P.2d 456]; *Estate of Flint,* 179 Cal. 552 [177 P. 451]; *In re Redfield,* 116 Cal. 637 [48 P. 794]; *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149]; *Estate of Bemmerly,* 110 Cal.App. 550 [294 P. 33]; *Estate of Dolbeer,* 149 Cal. 227 [86 P. 695, 9 Ann.Cas. 795].)

█ Tested by the standards laid down in these cases, there can be no reasonable doubt that the evidence produced by the respondent amply supports the finding of the trial court that the testator lacked the requisite testamentary capacity to make a valid will.

Antonio Pessagno died on October 10, 1941, at the age of 72 years. The challenged will was executed by him on December 29, 1939. He left a substantial estate consisting of money in the bank, outstanding loans, shares of stock, and a piece of real property. By the will he bequeathed the real property to the Shriners, some stock valued at about $500 to Andre Ghiotti, and the residue to Henry A. Pleitner. Neither of these last two legatees was related to the testator. His closest relative was Joseph Pessagno, the contestant, his half brother.

Tony was born in Italy, and came to this country in the early part of this century. He could speak and understand English, and could read, write and speak Italian, but could not write or read English except to a very limited extent. In his early years in this country, and until the advent of prohibition, he operated a saloon in West Oakland. Thereafter, he sought employment for several years out of Oakland, apparently spending most of this period in Richmond. In 1918, while at Richmond, he suffered a stroke which partially paralyzed one side and caused him to limp. From 1919 to 1922 Tony lived with his half brother, the contestant, and in 1921 made a will leaving his entire and substantial estate to Joe. After leaving the residence of Joe, Tony went to live in a house at Eighth and Filbert Streets, Oakland, and about 1931 moved to quarters at 725 Third Street, Oakland, which he rented from Frank Migalo for $6 per month. During a

considerable portion of this period he sold newspapers on a street corner in downtown Oakland. In 1935, and again in 1936, he was a patient in the Alameda County Hospital where he was treated and operated upon for an eye condition.

In 1937, Louis Pessagno, another brother, died intestate, leaving Joe and Tony as his heirs at law. Louis' estate consisted of a house and lot at 1511 Union Street, Oakland, appraised at $2750, cash in the sum of $344.35, and stock valued at about $9000. Although Tony at that time was, to use the words of the attorney who drafted the will and who was a witness for appellants, ''a perfect example of a miser,'' he insisted that all that he wanted from Louis' estate was the house, and that Joe should take the balance, and he executed an agreement to that effect. Thereafter, he lived in indescribable squalor in the basement of the Union Street house, renting out the upper rooms. Joe testified that one of the things that first caused him to believe that Tony was of unsound mind was his agreement to accept such a small portion of Louis' estate.

It was during the 1930's, and particularly about 1936 or 1937, that a marked change occurred in Tony's mental condition and in his way of life. Previously, Tony dressed properly, wore good clothes, and kept his person and clothes clean. He apparently had many friends and acquaintances. After he went to live at Union Street, his clothing became dirty and ragged, his appearance very disagreeable, and he acquired a noticeable body odor. At times he did not recognize, and sometimes would insult, his intimate friends and relatives. During 1938 and 1939 he frequently walked the streets of Oakland with one trouser leg down and the other above his knee. He told one witness in 1939 that ''Oh, this morning I saw Virgin Mary. My mother [who had been dead many years], she is Virgin Mary. She pray for me.'' He was in the habit of frightening little children and would walk about the street striking them with his cane. He would try to cut the lawn in front of his residence with a pair of scissors. He used to roam the streets in the early hours of the morning, rain or shine, dressed like a rag man, mumbling to himself, and picking up refuse and newspapers out of garbage cans and cigar and cigarette butts from the gutters, and picking up fruit and vegetable scraps from the sidewalks and gutters. All these articles he would put in a sack and

carry home. He would pick up and carry home women's used sanitary napkins. When Tony moved from Migalo's house in 1937 the owner found many of such napkins in the house. His mattress at the Union Street house was filthy and full of bed bugs. The appellant Pleitner described the living conditions as "very dirty" and "filthy."

In September of 1938 Tony became quite ill. He was taken to the county hospital. His hospital record shows that he then informed the attendants that he had worked most of his life as a farmer, and he signed statements that he had no money. These statements were false. At that time it was discovered that, among other things, he was suffering from *tabes dorsalis,* which is a form of the last stage of syphilis.

For many years Tony belonged to the Druids, and apparently, in his early years, took an active interest in the lodge. In 1938 he began to draw sick benefits, first at the rate of $5 per week, and later, under lodge rules, this was reduced to $1 per week. Dues were $1 per month. Had Tony paid this $1 per month he would have received the $1 weekly benefit for life, but in 1939 or 1940 he allowed his dues to lapse.

In the early part of 1939 Tony's illness continued. Joe took him to the doctor two or three times a week. It was about this time that Tony complained that he had a "noise like an automobile" in his head, and that "I got high pressure in my head like a balloon."

In about April, 1939, Tony told Joe that he wanted to give him the Union Street property, and that he wanted to have his stock and bank accounts put in their joint names. Tony signed the requisite stock endorsements and bank slips to accomplish this purpose, and executed, and delivered, in the presence of the notary, a deed to the Union Street property naming Joe as grantee. Joe testified that he believed that Tony did not know what he was doing when he executed these documents, but took them to keep Tony from getting excited and angry. Joe did not record the deed, nor did he ever try to use any of the other property thus transferred to his name.

During this period while Tony was sick he had Joe go to the office of Mr. Pleitner, uncle of the appellant of the same name, a money lender and real estate broker, to collect interest due Tony on certain real estate loans he had made through Pleitner. He told Joe the amount of interest due him.

Also during this period Joe found that Tony was keeping

about $600 in a drawer in the basement of the Union Street house. The money was in small change and some paper. Joe warned Tony about the possibility of theft and inquired why Tony kept the money at home. Tony said he was going to build a three-room apartment on top of the garage. Joe induced him to put the money in the bank.

Several months after transferring the bank accounts to their joint names, and late in 1939, Tony told Joe he wanted everything returned to him. He told Joe he wanted to sell the stock so he could go to an unidentified place to make a speech. Joe immediately delivered the bank books and stock to Tony. During the interval while Joe had possession of this stock the Transamerica stock had been re-issued cutting down the number of shares, so that what had been eighty-four shares became forty-two shares. When Joe explained this to Tony the latter got mad at Joe. Joe was unable to find the deed. He thought he had placed it in his safe deposit box but was unable to find it. He had recently moved his residence and thought he must have lost it, and so informed Tony. The latter was not satisfied with this explanation and insisted that the deed be returned. Tony consulted Mr. Cianciarulo, an attorney whom he had known for many years, to secure his assistance in recovering the deed. Tony told the attorney that Joe had secretly removed the deed and the stock from a box in Tony's house. The evidence shows that these statements were false. In January, and again in March, 1940, Cianciarulo wrote to Joe demanding the return of the deed. In March, 1940, Joe found the deed folded in some insurance papers and immediately returned it. During this period Tony frequently told Cianciarulo he wanted him to draw a will for him, but did not tell him that he had another attorney draw a will for him on December 29, 1939.

On or about December 4, 1939, Joe called on Tony and asked him if the taxes had been paid on the Union Street property. Tony said he was not going to pay any taxes because a policeman had told him that he did not have to pay taxes since he was not working. Joe paid the taxes, and later Tony acknowledged receiving the receipted bill.

As already indicated, for many years Tony had placed money for investment with Henry Pleitner, a money lender and real estate broker, who invested the funds of his clients in real estate loans. This man was the uncle of the appellant

of the same name. Tony had placed $4,900 with Pleitner for such purposes. The elder Pleitner died in September, 1939, and it was then discovered that for some time he had been collecting interest and principal payments on his clients' loans, remitting to his clients only the interest payments, and commingling the principal payments with his own funds. The young Mr. Pleitner told Tony of his uncle's actions, and recommended that Tony see Mr. Sherwin, the young Mr. Pleitner's personal attorney, to see about filing a claim against the estate of the elder Pleitner. In October of 1939 Pleitner took Tony to Sherwin's office to see about filing the claim. Both Sherwin and Pleitner told Tony that the elder Pleitner had collected over a thousand dollars of the principal of Tony's loans and had commingled them with his own. Between October and December, 1939, Tony had four or five conferences with Sherwin concerning the claim. The will was drawn by Sherwin on December 29, 1939. As already indicated, the will makes Pleitner the residuary legatee, and makes two other bequests, one to the Shriners and one to Andre Ghiotti. Concerning the Pleitner bequest, the will recites that the residue of the estate "to my friend, Henry A. Pleitner in appreciation of his kindness and the kindness of his uncle to me for many years." Sherwin testified that Tony discussed his property with him, and named the proposed legatees, including the Shriners, because of his desire to help crippled children. He told Sherwin he wanted Joe cut out completely and would not consent to even a nominal bequest to Joe as suggested by Sherwin. He named Ghiotti as a legatee because he had known him as a child in Italy and had seen him a couple of times since coming to this country. Sherwin drafted the will and it was properly witnessed by him and his secretary. Both gave it as their opinion that Tony was sane on that day.

About the middle of 1940 Tony became so ill he was taken to the Jackson Home, a sanitarium. In July of 1940 he was first examined there by Dr. Crockett. The doctor testified that when he examined Tony he found that he was irrational, noisy and incoherent. He thought he was in jail, and that the doctor, whom he had never seen before, was an old friend. The doctor found that Tony was suffering from syphilis of the third and last stage. His diagnosis was that Tony was suffering from *senile dementia*. He gave it as his opinion that Tony was of unsound mind in July of 1940 and that that condi-

tion had existed for some time. He treated and examined Tony some four or five times thereafter, and frequently saw him at the Home. On all of these occasions Tony was, in his opinion, of unsound mind. Tony was later transferred to a Catholic sanitarium. He usually called the doctor "Father," indicating that he had met the doctor in a religious capacity.

In August of 1940 Frank Meillette, an employee of one of the banks where Tony had his bank account, and who had handled the account for Tony for many years, signed a petition prepared by Sherwin for the appointment of a guardian of the person and estate of Tony. The petition recites that Tony "has by reason of old age and illness become mentally incompetent either to care for himself or manage his property." In September, 1940, upon the basis of this petition, the probate court appointed Meillette guardian of the person of Tony and the bank guardian of his estate, expressly finding that Tony was then "an incompetent person and incapable of taking care of himself and managing his property." Many witnesses testified that Tony's mental condition was about the same from 1939 until the time of his death. He died at the Jackson Home on October 10, 1941.

This fairly summarizes the evidence produced by respondent. Appellants emphasize the evidence that Tony managed his financial affairs to some extent, and contend that the evidence falls short of the requirements laid down in the cases cited in the first part of this opinion. It is true that the evidence that Tony lived in squalor and filth, that he was unkempt, that he collected garbage and fruit from the gutters, that he failed to recognize intimate friends and acquaintances, and did other abnormal acts, standing alone, is not sufficient to sustain a finding that he lacked testamentary capacity. This is equally true of the evidence that he was a miser. Standing alone, the evidence of the judicial declaration of incompetency some eight months after the execution of the will would not support the challenged finding. It may be conceded that Dr. Crockett's testimony as to his mental condition in July of 1940 would not alone support the finding. But these various factors do not stand alone. Here they all occur together. We have here a man who for many years lived a normal and apparently sane life. Gradually his manner of life changed to that heretofore described. He was admittedly a miser. He had never drawn one cent from his

account with the Central Bank. His mind was obviously beginning to disintegrate from the ravages of syphilis and old age as early as 1937. In that year this "typical miser" willingly insisted that Joe take the bulk of Louis' estate. This man, who was so miserly he would not buy proper food, clothing or shelter allowed his lodge dues to lapse when, by the expenditure of but $1 a month, he could have drawn at least $4 per month as sick benefits. Although Tony was told in October, 1939, that Pleitner had, in effect, embezzled over a thousand of the dollars so laboriously and carefully saved, in December of 1939 he executed a will leaving the largest portion of his estate to Pleitner's nephew because of Pleitner's "kindness" to him. When this testimony is coupled with the records of the county hospital produced by appellants showing that in 1938 he was in the third stage of syphilis, and that of Dr. Crockett that in July of 1940 he was in the last stages of that disease, was incoherent and irrational, was suffering from *senile dementia* and was of unsound mind, and that that condition was of long standing, and when this testimony is considered with the admitted fact that in September of 1940 Tony was judicially declared incompetent, it is quite clear that the trial court was justified in finding that Tony's mind had so disintegrated by December 29, 1939, that he no longer possessed testamentary capacity.

It is true that Dr. Crockett did not examine Tony until July of 1940, and that Tony was not declared incompetent until September of that year, and that, standing alone, this evidence would not establish mental incompetency as of December 29, 1939. But such evidence is admissible, and if connected up with testimony that the condition was the same on the earlier date as it was on the later date, it supports the finding of incompetency on the earlier date. (*Estate of Johnson,* 200 Cal. 299 [252 P. 1049]; *Estate of Loveland,* 162 Cal. 595 [123 P. 801]; *Estate of Ehle,* 115 Cal.App. 656 [2 P.2d 398].) Doctor Crockett testified that the condition he found in July, 1940, had prior existence and was not the product of immediate illness. Joe testified that the mental condition of Tony remained unchanged from 1937 until his death in 1941. Ghiotti testified that Tony was in the same mental condition when he saw him in 1939 as he was when he saw him in October, 1940, after the adjudication of incompetency. Pleitner testified to substantially the same effect, as did the witness Meillette. This evidence clearly connected up the testimony of Dr. Crockett and the evidence of the judicial

declaration of incompetency within the meaning of the rule announced in the above cases.

Appellants place particular reliance on the case of *Estate of Finkler*, 3 Cal.2d 584 [46 P.2d 149], in support of this appeal. A reading of the majority opinion discloses that the main theory relied upon by the contestants in that case was that the testator was affected with insane delusions. They proved that fact. ▮ But for delusions and hallucinations to deprive a person of the power to make a will such delusions and hallucinations must bear directly upon and influence the terms of the will. (*Estate of Perkins*, 195 Cal. 699 [235 P. 45].) In the Finkler case, according to the majority opinion, the contestants failed to prove that connection. In referring to the evidence the majority opinion, at p. 589, states: ''The evidence respecting the alleged insanity relates almost exclusively to certain delusions possessed by the testator but no one of said delusions was shown to be such as would or could affect the testamentary disposition of his property.''

That is not the type of insanity here relied upon. In the instant case the theory of the contestants is that the testator suffered from general mental incompetency. It is well settled, of course, that general mental incompetency is sufficient to deprive a testator of the power to make a will. As already pointed out, the evidence here is susceptible of the reasonable conclusion that, by reason of the ravages of disease and old age, Tony was mentally incompetent in a general sense.

▮ Appellants place some reliance on the evidence that Tony was capable of carrying on certain banking transactions. These transactions consisted mainly of routine deposits and transactions handled mainly by the bank employees. This testimony, while entitled to careful consideration by the trier of the facts, is not conclusive on the issue. In *Estate of Hansen*, 38 Cal.App.2d 99, 111 [100 P.2d 776], the court disposed of a similar contention with the following statement: ''The record of the testator's banking transactions about the time of the execution of the will furnishes only a conflict of evidence regarding his mental capacity which we assume the jury fully and fairly considered. The jurors were the sole judges of the weight of that evidence.''

▮ Appellants place considerable reliance on the testimony of Mr. Sherwin, the attorney who drafted the will. It seems to be the thought of appellants that the trial court

was required to either believe the attorney or to question his integrity. That is not the law. Mr. Sherwin believed that Tony was of sound mind, and, from what he knew and observed, had reason for believing that Tony appeared to know what he was doing. But Mr. Sherwin did not know of the mass of testimony above referred to that supports the conclusion that Tony did not know what he was doing. In his order denying the motion for a new trial the trial judge stated: "After further consideration, the Court is convinced even more strongly than before that from 1937 to the date of his death, Antonio Pessagno was not competent to make a will. This view of the Court is not in any sense, as counsel intimated, a reflection upon the attorney who drew the will and who testified that in his opinion Pessagno was of sound mind. The Court does not doubt the integrity or good faith of said attorney, but under the evidence, as the Court has weighed it, the Court must and does disagree with his opinion as to the soundness of mind of deceased."

A similar thought was expressed in *Estate of Hansen*, 38 Cal.App.2d 99, 115 [100 P.2d 776], as follows: "The testimony of an attorney who draws a will, and who also becomes a witness to the instrument, to the effect that the testator appeared to be of sound mind and memory, is entitled to serious consideration. It has been said his evidence may be entitled to *more* consideration than that of a mere relative, friend or acquaintance. But it is not conclusive when other witnesses have testified to the contrary. Such evidence creates only a conflict. The jury must finally determine the weight and sufficiency of the evidence. (*Estate of Nelson*, 134 Cal. App. 561 [25 P.2d 871]; *Estate of McDonald*, 191 Cal. 161 [215 P. 545].) When there is substantial evidence to support the finding of a jury on any material issue, its determination of that issue will be upheld." (See, also, *Estate of Miller*, 16 Cal.App.2d 154 [60 P.2d 498].) For these reasons the trial court did not abuse its discretion in denying the motion for a new trial.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.

A petition for a rehearing was denied May 28, 1943, and appellants' petition for a hearing by the Supreme Court was denied June 24, 1943.