[Civ. No. 13323.   First Dist., Div. One.   Mar. 14, 1947.]

CADWALADR HUGHES, as Administrator, etc., Respondent, v. JOHN GRANDY, Appellant.

Franklyn M. O'Brien and James C. Espey for Appellant.

Elmer P. Delany and James A. Himmel for Respondent.

BRAY, J.—Appeal by defendant from a judgment in favor of plaintiff administrator in an action to recover certain real property transferred to defendant in her lifetime by plaintiff's intestate. The action was originally brought by the guardian of the person and estate of Hannah Elinor Stewart, an incompetent person. Upon the death of Mrs. Stewart plaintiff administrator was substituted.

The complaint contains three causes of action. The first alleged that Hannah Elinor Stewart was mentally incompetent to make a deed of her property at the time of the conveyance to defendant, and "by reason of old age, disease and weakness of mind was a person unable to properly manage and take care of herself and her property, and by reason thereof was easily deceived and imposed upon by artful and designing persons;" that knowing of her physical and mental infirmities and condition, and for the purpose of unjustly and illegally enriching himself, defendant enticed, persuaded and prevailed upon the said Hannah Elinor Stewart to transfer the said real property to him without consideration.

The second cause of action alleged that by the same means the defendant obtained dishes, silverware, household belongings and other personal property of Mrs. Stewart, and also $700 of her money. The court found that prior to Mrs. Stewart's death and during certain guardianship proceedings, this money, after a court hearing, was returned by the defendant to the then guardian of the person and estate of Mrs. Stewart. No finding was made concerning the alleged transfer of the household goods and other personal property. It is therefore unnecessary to consider this second cause of action any further.

The third cause of action contained the usual allegations of a quiet title action.

Appellant bases his appeal on three grounds: (1) That respondent failed to prove by a preponderance of evidence that Mrs. Stewart was mentally incompetent to execute the deed in question; (2) That the court erred in the introduction of certain evidence; (3) That there was insufficient evidence to support the findings and judgment. Points (1) and (3) will be considered together, as they practically cover the same subject.

The court found that for some time prior to and on the first day of January, 1945, Mrs. Stewart was a widow, ''aged about seventy-seven years, and by reason of old age, disease and weakness of mind was a person unable to properly manage and take care of herself and her property, and by reason thereof was easily deceived and imposed upon by artful and designing persons''; that a short time prior to January 6, 1945, defendant went to the office of John J. Lagorio, a notary public in the city of San Francisco, and asked him to prepare a deed of gift from Mrs. Stewart to defendant, showing love and affection as the consideration; that on or about the eighth day of January, 1945, Lagorio, as such notary, went to the home of Mrs. Stewart, and then and there, in the presence of defendant, presented the deed to Mrs. Stewart for her signature, no other persons being present; that Mrs. Stewart signed the deed and delivered it to the defendant; that Mrs. Stewart was not advised by Lagorio as to the legal significance of said deed of gift, nor did he hold any private consultation or interview with said Mrs. Stewart; that all of the activity of the execution of the deed was had in the presence of the defendant; that Mrs. Stewart did not have any independent legal advice; that, unknown to Mrs. Stewart, defendant caused the deed to be recorded; that at the time of executing and delivering the deed Mrs. Stewart was not mentally competent to execute and deliver said deed; and that she received no consideration for it.

The principal issue to be determined is that concerned with the sufficiency of the evidence respecting the mental competence of the grantor on January 6, 1945, the day of the execution and delivery of the deed to appellant. Before discussing the evidence it is well to consider the rules of law applicable here. The question is not, as contended in appellant's opening brief, where the preponderance lies, but

whether there is substantial evidence to support the findings. In *Rinker* v. *McKinley*, 65 Cal.App.2d 109 [149 P.2d 859], the same contention was made, and the court said, at page 110: ''This proposition is untenable, for the rule is established that it is not sufficient ground for reversal of a judgment for an appellant to point out or to even demonstrate to an appellate court that a finding is against the preponderance of the evidence; he must show that there is not any substantial evidence to sustain the questioned finding. (*Meyer* v. *Great Western Ins. Co.*, 104 Cal. 381, 386 [38 P. 82] ; *J. & H. Goodwin, Ltd.* v. *Franich*, 37 Cal.App. 493, 494 [174 P. 83].)'' ''. . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion . . .'' (*Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].)

Disregarding all conflicts in the evidence, and giving to the evidence the weight to which it is entitled by an appellate court, there can be no doubt that the evidence supports the court's finding. The property involved, worth about $4,500, is comprised of two contiguous lots on Gambier Street in San Francisco, on one of which was the house in which decedent lived. Plaintiff is the brother of the decedent. Defendant is no relation. Decedent lived with her husband on the property for some time prior to his death in May, 1944, and then continued to live there until her commitment to Agnews State Hospital on June 27, 1945.

Mrs. Marie Harris testified that she had known decedent for about three years, and visited her practically every day through 1944, and thereafter until Mrs. Stewart went to Agnews, and sometimes decedent would visit the witness' home three or four times a day. Mrs. Harris first noticed something wrong with decedent in September, 1944. Her mind was getting bad—she could not remember anything. Her mind was just as bad on January 6, 1945. During her husband's lifetime Mrs. Stewart had been a very neat housekeeper, but in late 1944, she became very untidy in her house and everything was in a turmoil. Decedent moved her furniture and other things into her kitchen because she imagined there were hoodlums coming into her house at night through the attic, and she wanted to be in the kitchen, where she could watch them. Decedent would try to tell Mrs. Harris things, but would not be able to remember. Decedent became ill on

December 22, 1944, and Mrs. Harris did not believe she ever became well again. She did not believe that on January 6, 1945, decedent would know about transferring property. In the opinion of the witness decedent on that date was not competent to transfer property or transact any business. The witness had seen appellant put his arm around decedent in a loving and affectionate way, and feeding decedent with a spoon when she was capable of eating by herself. One night early in November, 1944, decedent came to the Harris home and asked if she could remain for the night. Mrs. Harris put her to bed, and at 2 a. m. decedent was sitting in the kitchen fully dressed, even wearing her hat. Decedent said she was going home because it was morning. Mrs. Harris tried to persuade decedent to go back to bed, but she fell asleep in a kitchen chair. Mrs. Harris awakened her, and she went back to bed with her clothing and shoes on, taking off only her hat and galoshes. She would not take off her clothes or shoes. She broke her glasses, and thereafter appellant read the newspapers to her. Between December 22, 1944, and January 6, 1945, Mrs. Harris visited decedent almost every morning, and she seemed in a daze most of the time, and Mrs. Harris could not carry on a conversation with her.

Mrs. Rose Wells, a neighbor who had known decedent for about three years, testified that she noticed a gradual change in decedent from the time of her husband's death. Decedent had been taking care of Mrs. Wells' small boy since January or February, 1944, but because of the decided mental change which Mrs. Wells noticed in decedent in December, she took the child from her. Decedent told the witness that people were walking about the house taking things. She had a loaded shotgun which the witness took away from her. In December, decedent said that Mr. Stewart (dead since May) was lying beside her all night. Most of the time she thought there were people in the house, when actually there was no one there. Decedent imagined that a man had taken over one of the bedrooms and was living there. In early January she carried her deceased husband's shirts over to the witness' house in a bundle and kept them with her for fear someone would steal them. On one occasion decedent visited the witness' house, without any dress on, just her overcoat. She became very untidy and unkempt, even filthy, in caring for her house. Mrs. Wells noticed quite a deterioration of decedent's mental faculties during 1944; and in her opinion, decedent on Janu-

ary 6, 1945, was not competent to transact business affairs or to execute a deed; she was not "in her right mind to do anything like that."

In February, 1945, Richard W. Evans, a resident of Racine, Wisconsin, on naval duty in San Francisco, called to see decedent at her home. He had been requested so to do by Robert Hughes, another brother of decedent's, whose home was in Racine, because her relatives had sent her a gift at Christmas, had received no acknowledgment of it from Mrs. Stewart, and thought that something was wrong. Evans spent two or three hours with her, and testified that she seemed interested in her relatives in the east, and spoke very kindly of her brothers. She seemed untidy, and the house was messy. She faltered in her expressions, had a failing memory, and did not carry on a coherent conversation. She spoke of appellant as her "guardian angel." She stated that several times she had started to write to her eastern relatives, but that she could not express herself properly. While she seemed to understand Evans, she spoke falteringly.

Immediately after respondent came to San Francisco and on April 10, 1945, respondent called upon decedent, and he testified that she appeared in a "kind of daze," but invited him into her house after he told her who he was. In June, 1945, he took up residence in her house. Decedent insisted to him that the property was still hers, that it was not appellant's. She contradicted herself in regard to having given the deed to appellant. Respondent then started guardianship proceedings, and decedent's attitude toward him changed. She thought that appellant was all right, and respondent was getting in the way. He also testified that he had found four money orders which decedent had bought but had forgotten to mail to the payees.

Appellant's own testimony was to the effect that he had known decedent for about five years. He was 64 years old at the time of the trial. He visited decedent almost daily after her husband's death, and decedent had given him the property because he was the only friend she and her husband ever had, and because he was kind to her after her husband's death. Decedent also gave him some dishes, "a few things like that, and a few carpenter tools" which had belonged to her husband. Decedent had had $700 in her sole name in the bank, and at her request he had transferred it to another bank, and into a joint tenancy account with himself. Ninety dollars of this ac-

count was withdrawn. After the guardianship proceedings were started, and without any instructions from decedent, or even informing her, he changed the account to his own name solely, because his then attorney advised him to do so. (This is the money referred to in plaintiff's second cause of action, and which under the court's order in the guardianship proceedings, defendant returned to the guardian.) Appellant knew that Mrs. Stewart had a legal adviser at the time of the execution of the deed, but appellant did not suggest that she advise with him, nor did appellant have him prepare the deed.

Appellant places principal reliance upon the testimony of the notary public, Lagorio. This witness stated that prior to January 6, 1945, he knew appellant and "was doing some things for him." He had not known decedent prior to the day she signed the deed. On that day, appellant asked the witness to draw a deed of gift from decedent to appellant of the property concerned, appellant supplying the description. The witness brought the deed to decedent's house that afternoon. Appellant was already there with the decedent. During the entire transaction no other persons were present other than appellant, decedent and the witness. The witness asked decedent if she was the party who was going to give the property to appellant, and she replied, "yes." Thereupon the witness said, "You will have to sign the deed," which she did. After taking her acknowledgment, the witness gave the deed to decedent and asked her if she wanted to give it to appellant at the time. She said "yes." He then said, "You can pass it to Mr. Grandy in my presence and I will witness the passing and the delivery of the deed," which she did. It is apparent that the witness went to decedent's home on the assumption that she was going to execute and deliver the deed, and that he there took charge of the proceedings, did not discuss the transaction in any detail with her, and proceeded to get the matter concluded as expeditiously as possible. He testified that decedent was in "first class mind, sound mind, and good memory," and that no influence of any kind was brought to bear on her while he was there. He was there altogether about fifteen to twenty-five minutes. He did not see decedent at any time thereafter. The only conversation that took place was as above set forth, except that they talked about the weather and decedent's memory.

Miss Ethel DuRivage, a witness for appellant, testified that she had known decedent for twelve or fifteen years, and visited

her six or eight times during 1944, after Mr. Stewart's death. Decedent was quite ill about holiday time, and was delirious for a month or so. The witness visited decedent right after Christmas, and then again a week or so later. Decedent told her appellant had been very kind to her, and that she wanted him to have everything decedent had. Decedent said she did not have much use for her family, and did not want them to have anything she possessed. In the opinion of the witness, decedent was competent on January 6th. Appellant was always very kind and gentle to decedent, and decedent treated him as a brother or a son. On Sunday, January 7th, when the witness visited decedent, she was weak from her illness, "delirious at times, and some things she remembered and other things she didn't remember." The witness asked decedent if she had made a will and "she gave me to understand she had. She said she had left everything to Mr. Grandy, or wanted him to have everything. I don't know which words. She didn't say by will or deed or how." Decedent in the latter part of her life told the witness that she had lost some things and she thought somebody was in the house and taking them.

Mrs. Florence McLeod, a defense witness, testified that she knew decedent intimately the last eight years. The witness noticed no change in decedent's general condition until after respondent came, although she had a weakness which the witness attributed to her December illness. The witness noticed nothing peculiar with decedent's mentality during a visit with decedent Christmas night, 1944. Decedent told the witness that her relatives had never been good to her, that she had left the east to get rid of them, and she hoped they would not come out to "bother her." The witness observed appellant ministering to decedent in her home, and decedent in the latter part of January told the witness that decedent had transferred her property and everything she had to appellant. The witness considered decedent of sound mind on Christmas night, and also on January 15, 1945, which was the next time she saw decedent.

Another defense witness, Rose Ruiz, was a neighbor of decedent, and testified that they often visited each other's homes. Their acquaintanceship began in 1943. She saw decedent regularly in December, 1944, and January, 1945, and noticed no difference in decedent during that period. Shortly after January 5th, decedent was able to carry on a conversation and

go shopping. Decedent told the witness that she was giving everything to appellant as she did not want her folks coming and seeing her. In the witness' opinion decedent knew what she was doing on January 6th.

The rules governing capacity to execute and deliver a deed are in general the same as those governing testamentary capacity. (*Hemenway* v. *Abbott*, 8 Cal.App. 450 [97 P. 190]; 9 Cal.Jur. 117, §§ 21-22; 5 Cal.Jur. 10-Yr. Supp., p. 135.)

In 9 California Jurisprudence 117, section 21, it is said: "It is difficult to formulate any rule determining the degree of mental weakness which will destroy a person's capacity to convey property . . . mental competency requires that the mind and memory of the grantor be sufficiently sound to enable him to know and understand the business in which he was engaged at the time he executed the deed." At page 119, section 22, it is said: "Old age alone does not render a person incompetent to execute a deed. Nor will sickness, extreme distress or debility of body affect the capacity of the grantor to make a conveyance if sufficient intelligence remains." Therefore, the issue of competency must be determined from all of the circumstances surrounding the transfer.

Appellant vigorously contends that the only evidence that can be considered is as to decedent's actions and condition on the very day of the execution of the deed. He argues that testimony of respondent's witnesses concerning decedent's actions and mental condition prior and subsequent to that date is incompetent and immaterial, and, he reasons, as the only persons who saw her on that day were appellant and Lagorio, and as both of them testified that she was fully competent, there is no evidence upon which a court could find her to be incompetent on that day. But that is not the law. ". . . testimony as to the mental condition of the party before and after the time of the making of the instrument is admissible for the purpose of disclosing circumstances tending to show his probable condition of mind at the time of the transaction." (9 Cal.Jur. 120, § 23.) Of course, it is the mental condition of the decedent at the very moment of executing and delivering the deed that is important, but in arriving at that condition it is well settled that her condition of mind both before and after may be considered. The mere fact that adverse witnesses who saw her on the particular day testify that she was not mentally incompetent is not conclusive as against evidence which showed a continuing incompetency

over a period beginning before and continuing after that date. The trial court believed this latter evidence and did not believe that presented by the appellant. This court in that respect is bound by the trial court's finding.

Keeping in mind the principle that rules respecting competency to make a deed are about the same as those respecting testamentary competency (*Hemenway* v. *Abbott, supra;* 9 Cal. Jur. 117, supra), it is said in 26 California Jurisprudence 636, section 10 (Wills), that ". . . proof tending to show insanity at another time than that of execution of the instrument is relevant and admissible; and the contestant is entitled to have the jury pass upon its weight. . . ." The same rule respecting the execution of wills is enunciated in *Estate of Hartley,* 137 Cal.App. 630 [31 P.2d 240]. At page 633 thereof it is said: "Evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, are admissible so long as they have a reasonable tendency to indicate his mental condition at the time of the execution of the will. Its weight was for the jury to determine. [Citing cases.] This is particularly true when the characteristics of the malady indicate a permanent and progressing mental disease. This is the nature of senile dementia. [Citing cases.]" It is likewise said at page 633, quoting from *In re Carpenter's Estate,* 79 Cal. 382, 387 [21 P. 835]: " 'A marked change in a man's habits of thought is strong evidence of his mental unsoundness.' " It is further said in 26 California Jurisprudence 636, section 10 (Wills) that: "It seems that evidence tending to show insanity at another time is in no circumstances to be excluded purely on the ground that the point of time to which the evidence relates is remote from the date of execution."

The testimony in this case must be tested by certain standards. ". . . a person may be insane in the general acceptation of the term, and yet his insanity may be of such a character as not to deprive him entirely of the power of understanding the nature of ordinary business transactions, and . . . such form of insanity, or rather unsoundness of mind, does not render a person incapable of entering into a valid contract." (6 Cal.Jur. p. 33.) ■ A testator has sufficient mental capacity to execute a will (and, as pointed out before, the rule is the same as to deeds), if he has sufficient capacity to understand the nature of his act and is capable of fairly

and rationally considering the character and extent of his property, the persons to whom he is bound by ties of blood or friendship, and the persons to whom and the manner and proportions in which he wants the property to go. (*Estate of Purcell,* 164 Cal. 300 [128 P. 932].) In *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149], it was held that delusions, eccentricity and mental weakness alone were not sufficient to avoid the instrument. But it was pointed out in that case, at page 589: "No witness, however, attempted to say that he. [the testator] was so low in mentality that he could not transact business of every kind." In the present case two intimate acquaintances did testify that Mrs. Stewart in their opinion was not mentally capable of transacting any business, giving the reasons on which they based their opinions. As stated in *Estate of Pessagno,* 58 Cal.App.2d 390, at page 401 [136 P.2d 644], in distinguishing the facts in that case from those in *Estate of Finkler, supra:* "In the instant case the theory of the contestants is that the testator suffered from general mental incompetency. It is well settled, of course, that general mental incompetency is sufficient to deprive a testator of the power to make a will. As already pointed out, the evidence here is susceptible of the reasonable conclusion that, by reason of the ravages of disease and old age, Tony was mentally incompetent in a general sense." In our case the trial court could reasonably conclude from the evidence that by reason of illness, old age and increasing senility, the decedent was generally mentally incompetent.

Appellant vigorously contends (as he contended in the trial court) that at best, respondent's evidence indicates irrationality and failing mental and physical health, but not mental incapacity, and that therefore the evidence is not sufficient to justify a finding of mental incompetency. While the evidence indicative. of lack of mental capacity may not be overwhelming, and while there is a strong conflict between the witnesses of the respective parties on this subject, it cannot be found, as matter of law, (which this court would have to find in order to reverse the judgment) that there is no substantial evidence of decedent's incompetency on the day in question. ". . . the findings of the trial court can be overthrown only when they totally lack the support of substantial evidence." (*Nielsen* v. *Frank,* 117 Cal.App. 117, 120 [3 P.2d 607].) A summary of the testimony in this case substantially shows that decedent went into a mental and physical decline

subsequent to the death of her husband in 1944; that her previous habits of cleanliness about her home turned into habits of slovenliness and unkemptness; that she thought that thieves were entering her home and stealing her belongings; that she kept a loaded shotgun to protect against that imagined danger; that she thought spirits were in her home, and that her deceased husband had occupied the bed with her; that she went to bed with her clothes on in the house of a friend; that she entered a friend's house with only a coat on; that she was very ill immediately before the date upon which she made the deed; that, according to appellant's own witness, Miss DuRivage, on the next day after making the deed decedent was delirious and remembered some things and did not remember others; that decedent had suffered loss of memory; that she was unable to coordinate her thoughts sufficiently to write to her relatives in the east to acknowledge Christmas gifts; that her attitude towards her relatives changed from one of devotion and regard to one of animosity; that, although she had completely conveyed the property away, at times she still thought that she owned it; that she had denuded herself of all her real property and money without any provision made for her care or support, either by appellant or anyone else; that she had become senile, growing progressively worse from the death of her husband in May, 1944, until her commitment to Agnews in June, 1945; and that in the opinion of two of her friends who had observed her over a considerable period of time before and after January 6th, she was incompetent over that period and was incompetent on that particular date.

The opinions of intimate acquaintances are admissible on the mental competency issue, the weight to be given such testimony being for the trier of fact. (26 Cal.Jur. 740, § 86; p. 742, § 87.)

Now, it is true that quite a case can be built up from the evidence to support a conclusion that decedent knew what she was doing when she executed the deed; that appellant had been good to her and taken good care of her since her husband's death; that he was her "guardian angel"; that she had lost contact with her relatives and did not want to see them; that her actions were merely eccentric or peculiar; that she felt her brother was getting in appellant's way. In addition, three of her intimate acquaintances believed her fully competent to transact the business of executing and delivering the

deed. Appellant and Lagorio were of the same opinion. However, as pointed out before, it is not the province of this court to weigh conflicts·in testimony or decide where the preponderance lies. All this court can do is to determine if there is substantial evidence to support the court's findings. There is such support here.

The testimony of the witness Lagorio as to what occurred at the time of executing the deed and as to decedent's mental capacity at that time is not conclusive, as contended by appellant. The conflict which it creates with the evidence of respondent's witnesses is one which was resolved by the lower court in favor of respondent. This court must follow the lower court's determination in that respect.

Appellant's second point is that the court "erred in allowing, over objections of appellant's counsel, the introduction of certain evidence prejudicial to appellant." In neither of appellant's briefs does he give any transcript reference to indicate what evidence was admitted over his objection. Rule 15, Rules on Appeal, provides: "The statement of any matter in the record shall be supported by appropriate reference to the record." The failure to follow this rule has caused this court considerable additional work. We are unable to find in the record any evidence which comes within the category of appellant's specification of error. The nearest we can come to it results from the statement on page 6 of appellant's opening brief that the trial court erred in admitting, over appellant's objection, testimony given by Mrs. Stewart in the guardianship proceedings. Following this lead, we assume that appellant refers to the following situation, as shown in the transcript beginning with page 129. Appellant was on the stand under cross-examination by respondent. In response to the question "Is it not a fact that Mrs. Stewart didn't know that she signed any deed of gift to you?" appellant responded, "She certainly did know it." Thereupon appellant was asked without objection: "Have you any recollection of Mrs. Stewart ever making a statement to you, or to any other person or any other place that she had signed a deed, but she had not signed the deed over to you?" Appellant replied "No, I have no recollection of that." Thereupon Mr. Himmel, counsel for respondent, stated: "I might say, your Honor, that I am digressing a moment. I have here the entire transcript of the proceedings which I have had written up at the suggestion of Judge Fitzpatrick, and at

this time I would like to introduce the entire transcript in evidence, for identification, as Plaintiff's next exhibit in order. I think that will facilitate the matter because it is my intention to read certain excerpts. THE COURT: For identification there probably wouldn't be any objection. MR. O'BRIEN [counsel for appellant] : No objection. MR. HIMMEL: It may go in for identification, Exhibit for Plaintiff next in order. THE CLERK: Plaintiff's Exhibit No. 8 for identification. THE COURT: For identification? MR. HIMMEL: That is right, your Honor. No other purpose." It will be noted that this transcript of the guardianship proceedings was not offered in evidence, but without objection was received for identification. It never was admitted in evidence. Mr. Himmel then went on to call appellant's attention to page 25 of that transcript, reading some of it to lead up to the following questions asked of Mrs. Stewart to which she gave the following answers: "Q. When you gave this property to Mr. Grandy did you go to a Notary Public and transfer that property? A. No, indeed, I did not, and I don't intend to. Q. You don't intend to transfer your property, do you? A. No, I certainly don't. Q. And do you still own that property, do you? A. I do. Q. You still own that property? A. As long as I have it with Mr. Grandy. Q. But you still own the property, you are quite sure about that? A. Of course, I do. Q. Now, then, if I should say to you that on the 13th day of March, 1945, in Record 4190 of the Records in the Recorder's office of the City and County of San Francisco, page 420, that your property stands in the name of Mr. John Grandy, would that be true? A. Yes. Q. Well, now, who owns the property, Mr. Grandy, or you? A. Both of us. Q. Both of you? A. Yes. Q. You are quite sure that both of you own it? A. Yes." Having read the foregoing to appellant, Mr. Himmel then asked appellant the following questions: "Q. Were those statements made in the court room of Judge Fitzpatrick at the time I called to your attention? A. As far as I know. Q. Then you are in error when you say you thought she gave you this property, is that right? A. No, I am not in error." No objection whatever was raised by appellant's counsel to the reading of the above quoted portions of the guardianship proceeding transcript, nor to the questions asked appellant by Mr. Himmel. It is apparent that the only purpose of reading from that transcript was to attempt to impeach appellant by confronting

him with Mrs. Stewart's statements made in the guardianship proceeding, and which respondent claimed was contrary to the situation disclosed in appellant's answer. ▮ Just why appellant now objects when he did not object in the trial court is not clear. He claims that the testimony of Mrs. Stewart at the guardianship proceedings is not admissible in this case to show the circumstances of making the deed, and cites *Estate of Anderson*, 185 Cal. 700 [198 P. 407]. There are two answers to that contention here: first, the testimony was not offered for that purpose, but merely as an attempt to impeach appellant by showing that he had heard Mrs. Stewart make statements which he had denied he had heard; and secondly, no objection whatever was made to the introduction of the testimony. Having failed to object in the trial court, appellant cannot for the first time object here. (10 Cal.Jur. 824, § 111; 5 Cal.Jur. 10-Yr. Supp. 588, § 111.)

Appellant states: ". . . we find in 26 Cal.Jur. p. 632, that 'incompetency to make a will is not established by the fact that the decedent was adjudged to be incompetent in guardianship proceedings.' [citing cases]" As this statement is included in the paragraph in the brief where he claims that the court erroneously admitted the testimony of Mrs. Stewart in the guardianship proceedings, we assume that he is still referring to the matters hereinbefore quoted from the transcript of those proceedings. As pointed out above, the testimony was not admitted for that purpose and was not objected to.

▮ However, the fact that decedent had been declared incompetent and a guardian appointed, was admissible for the purpose of showing the decedent's mental capacity at that time; and where, as here, there is testimony tending to show that the mental condition of the person has not changed between the date of the act in question and the appointment of a guardian, the appointment, although later in time, is admissible on the issue of capacity when the act was done. (*Estate of Loveland*, 162 Cal. 595, 599 [123 P. 801].) This rule, of course, would not admit the testimony taken at the guardianship hearing, but, except for the small amount of testimony heretofore quoted, used in attempted impeachment without objection, none of the testimony was admitted. The fact that the declaration of incompetency was made five months after the execution of the deed goes to the weight

the court should place upon it, and not to its admissibility. (26 Cal.Jur. 636, § 10.)

Appellant finds additional fault with that portion of the findings which, after finding that Mrs. Stewart was a person unable properly to manage and take care of herself and her property, goes on to find: "and by reason thereof was easily deceived and imposed upon by artful and designing persons." As to this finding the evidence, which showed, among other things, that appellant employed a man to draw the deed who "was doing some things for him"; that that man and appellant were the only persons present at the execution and delivery of the deed; that Mrs. Stewart had no independent advice, nor opportunity to get any; that Lagorio came with the deed and acknowledgment all filled out, except the signatures; that Lagorio, according to his own testimony, told decedent "You will have to sign the deed" and then instructed her to give it to appellant in his presence; that appellant obtained from decedent all her real and personal property, including the moneys in the bank account which he was forced in the guardianship proceeding to return—all this and the other circumstances in the case support such a finding.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.