[Civ. Nos. 15716, 15717. Second Dist., Div. Two. July 1, 1947.]

Estate of OLIVER I. HALBERT, Deceased. MAUDE N. HALBERT, Appellant, v. NETTIE M. HALBERT, Respondent.

William Dellamore and E. W. Miller for Appellant.

Ernest A. Tolin for Respondent.

MOORE, P. J.—Two appeals are involved: one (15717) from an order denying probate of a formally executed will; the other (15716) from an order admitting to probate the holographic will of decedent. The former was based upon the verdict of a jury that the testator was of unsound mind at the time of executing the formal will on December 14, 1943; the latter was entered by the court without a contest as to the testator's competency. Inasmuch as the verdict on the contest was the fruitage of some documents and of the testimony of many witnesses, of conflicting opinions and of observations which justified contrary inferences, the task imposed upon this court is to determine whether the evidence adopted by the jury was sufficient to warrant a verdict of the testator's incompetency. The proponent of the will was a sister of decedent; the contestant was his wife. They are referred to herein as appellant and respondent respectively.

The testator died in his 64th year of a cerebral hemorrhage, February 19, 1945, 14 months after the date of the will. He had long suffered a psychosis with cerebral arteriosclerosis, a form of insanity due to hardening of the arteries of the brain. He and respondent were married in 1912. Life was not altogether a pleasant dream for them as three decades glided on, but no incurable clash preceded the year 1943. His habits had been those of the average man. For many years he engaged in the real estate and insurance business. In 1941, he suffered a spell of pneumonia, requiring hospitalization. He had imbibed much liquor prior to his illness. Thereafter he drank more and was frequently inebriated. His daily habits were changed. He became more easily and violently angered; appeared before his wife's company only partially clad in his pajamas; told obscene stories; threw dishes and food upon the floor; became abusive. He walked frequently out into

the hills clothed in pajamas, holloaed and paraded around; visited his friends when partially nude. He became incoherent and rambling. His eyes became slate grey and protruded.

Having inherited from her aunt at Akron, Ohio, in 1930, four chairs and a sewing table, respondent kept them in her Glendale home. She decided to sell them and discussed the matter with decedent. He advised her to advertise them and a rug for sale. Instead, respondent sold them on July 6, 1943, to her longtime friend, Mrs. Killackey. When on the following morning decedent missed one of the chairs from his room he called his wife to account, beat and bruised her, threatened to kill her until the neighbors had called the police and she had made her escape. She returned 10 days later. Again he took up the quarrel, saying, "I am going to kill you . . . I haven't long to live, I am going to kill you and kill myself." He grabbed her hair, bounced her up and down on the bed, backed her downstairs and said, "Call up that woman and tell her to get those things back here just as fast as she can or you are dead." This despite the fact that Mrs. Killackey resided some 11 miles away. After he had waited and watched awhile at the window for the furniture to be returned he knocked respondent down, got a bread knife and said he would cut her throat and insides out. In their scramble for advantage she escaped, screaming for the neighbors who once more called in the police.

Respondent was never afraid of her husband prior to these beatings, as a result of which she left their home and sued for divorce. Thereafter he began to harass her by telephoning to her many times daily. Sometimes he wished to see her, at other times he called her to threaten her that he would come down and "clean all of them out of the house" if she did not get them out; or he would chant: "four chairs, a table and a rug." As a result of the divorce proceeding she was restored to the possession of the home on November 18, 1943.

November 3, 1943, decedent mailed to respondent a sheet of paper on which was inscribed, "There was 4 chairs, 1 sewing table, 1 rug." November 12, 1943, he sent her by mail a letter which began "4 chairs, 1 sewing table, 1 rug" and concluded: "4 chairs, 1 sewing table, 1 rug, less you forget. I never will, Mrs. Halbert." November 14, 1943, he wrote her, "The last hour of your life you will be thinking of a sewing table, 4 chairs and a rug." November 27, 1943, he

wrote her "Thanksgiving day. I do not have 4 chairs nor a table and neither a rug." On December 3, he wrote her a note about "a lot of expense, a lot of heartache, a lot of misery, a hell of a future," and on the reverse side were drawings of the chairs, the sewing table and the rug, with descriptive words. In numerous other missives to respondent between the date of the will and June 6, 1944, decedent repeated his phrase with such religious accuracy and severity as to arouse in the mind of a reasonable person the suspicion of his sanity. Some of his letters contained drawings of the articles. In the fall of 1943, he wrote letters to Alice Fortier at respondent's home declaring that never for a minute had his thoughts been free of those coveted things. Also, he wrote six or eight letters to Mrs. Killackey, each of which contained nothing more than the same lament. During the same period he suffered the illusion that he was a veteran of World War I. He exhibited a scar and stated to a subscribing witness to his will that he had been wounded in a bayonet charge by a German. He told a client that he had been gassed and shell-shocked in France. His mind wandered and his speech was incoherent. His incoherency of speech had developed during the past 3 years. After respondent left him in July, 1943, he let the water run through an outside faucet so constantly that she had it turned off. He then began to take water in a 5-gallon bottle from Tujunga to his home, a distance of over 11 miles. The house became foul for lack of water in the toilet and the kitchen sink was full of mouldy food. For lighting he used borrowed coal oil lamps.

From nothing more than the unusual behavior of decedent during the year preceding and the year following the execution of the writing of December 14, 1943, the jury would not have committed gross error by finding him legally incompetent to execute a will. If he thought that his wife's legacies should have been controlled by him, and that he might beat her and drive her from her home because his wishes with respect to her separate belongings had been frustrated by her, it was not an illogical inference that he did not know his relation to his wife or his relatives, the nature of his property or the objects of his bounty.

But in addition to the details of his conduct as recited by a number of witnesses who had known him well, followed by their opinions that he was incompetent, there was other evidence of decedent's incapacity. Attorney Levy had acted as

his counsel in 1942. Between the 7th and 10th of December, 1943, at respondent's request, he interviewed decedent as a mutual friend of both with a view to effecting a reconciliation. At that interview the attorney formed the opinion that decedent was then so incompetent as to be incapable of having in mind "the situation of his estate and property and the natural objects of his bounty and his family relations," and the following week declined to prepare a will for decedent. Also, during the last 4 years of his life decedent was attended by Doctor Nelson, instructor in internal medicine and clinical pathology in a medical college at Los Angeles, who had been educated in psychiatry but was not a specialist. He observed that decedent had suffered from heart trouble, high blood pressure, asthma and arteriosclerosis, and testified that the latter ailment can exist in the anterior brain and that there it causes deficient circulation, loss of memory, slovenliness, "lack of finer judgment of situations in life with relationship to his wife and home and his friends and situations alike." Its existence in decedent's brain was evidenced by thickening of the retinal artery. Based upon his own observations and other proven facts, the doctor was of the opinion that decedent did not on December 14, 1943, have a clear understanding of the nature of his estate and property and of his family relations and of the objects of his bounty. Doctor Thompson, an expert alienist, testified to the same opinion.

Such evidences as those recited are sufficient, if believed, to establish testamentary incapacity. The testimony of an attorney who had served a testator and had become familiar with his habits of thought and conduct and who declined to prepare his will is entitled to serious consideration as proof of the testator's incompetency. (See *Estate of Hansen*, 38 Cal.App.2d 99, 115 [100 P.2d 776].) The jury was therefore not unreasonable in believing the witnesses of respondent and in drawing inferences from decedent's writings unfavorable to his competency and in rejecting the proof of appellant. (*Estate of Russell*, 189 Cal. 759, 763 [210 P. 249].) Decedent's delusion of having shrapnel in his body and a scar resulting from a bayonet wound in a war in a foreign land which he had never seen; his asserting the right to take from his wife her belongings to the extent of beating her on account of it and persecuting her daily with telephone calls and letters concerning it; his living in filth and stench rather

than to have the city water turned on at his home; his altered way in telling obscene stories to his wife—these facts indicate that he did not possess general testamentary capacity, did not understand the meaning of a will, recollect the property he undertook to transfer or the persons to whom he desired to make bequests, and that he did not comprehend his relation to his relatives, the natural objects of his bounty. (*Estate of Russell, supra,* 770; *Estate of Pessagno,* 58 Cal.App.2d 390, 394 et seq. [136 P.2d 644].)

Appellant contends that "none" of the isolated acts of decedent would influence the making of a valid will. She lists them as follows: intoxication, obscene stories, throwing dishes around when mad, visiting his neighbor's home in his pajamas, halloaing down a hill, the letter of November 12, *supra.* The evidence does not show that such events were isolated. Commencing with the day following respondent's sale of her furniture and rug decedent's intellectual processes seem to have crumbled. He had prior to the pneumonia been at times inconsiderate but following that illness his decay was certain. In the summer of 1943, his unseemly behavior became constant. Some irritating act occurred almost daily and they all indicated a new development. Such a marked change in his habits of thought evinced his mental unsoundness. (*In re Carpenter,* 79 Cal. 382, 387 [21 P. 835].) It was not one risque story he told but many; not one throwing of dishes from the table but such occurrence was often; not the one trip to a neighbor's home while meagerly clothed but the proof was that he repeated sauntering through his home almost uncovered before his wife's guests. He did not write merely the letter of November 12 about the rug, table and chairs but many missives, most of which said nothing but "4 chairs, a sewing table and a rug." Of course, if the jury had adopted appellant's proof it would have sustained the judgment. But such was not the fortune of the trial. The implied finding of decedent's general testamentary incapacity must stand despite the proof that he was still able in the fall of 1943, to transact his business of operating a real estate office.

One's ability to do the mechanics of his trade may continue in some degree even though he may be generally incompetent to write a will.

Moreover, the evidence warrants the finding that decedent suffered an insane delusion. Prior to respondent's disposal of the rug, table and chairs, he not only asserted no

interest in or claim thereto but actually advised her as to the procedure whereby to effect a more successful sale. But, what happened when the poor man discovered their absence from the home? He was seized with a violent passion for their restoration. His discomfiture by reason of their sale was an obsession. He never hesitated for a moment to consider that the articles were legacies to his wife from a former generation and that he had no moral or legal right (Civ. Code, § 162) to them. He preferred to wreck his home rather than that she should enjoy her right of disposing of a few trivial objects in which he had not the slightest interest and for the deprivation of which at an earlier period in his life he would not have uttered a word of protest. Such behavior can be ascribed to no cause other than to the "spontaneous generation of a diseased mind." (*Estate of Russell, supra,* 769, 771.) It is true that to justify a finding that a will was the product of an insane delusion the evidence must show that the delusion bore directly upon and influenced the creation of the terms of the document. (*Estate of Finkler,* 3 Cal.2d 584, 595 [46 P.2d 149]; *Estate of Pessagno,* 393.) Such is what the evidence adopted by the jury shows. While decedent had lived with respondent in the matrimonial relationship for over 30 years, yet during the period in which he executed the will he experienced a feeling of loathing and hatred for her. His violent animus was engendered by respondent's disposal of the sewing table and associate articles. It was therefore the product of his insane delusion.

On both the issue of decedent's general incapacity to execute a will and of his insane delusion the verdict of the jury is final. The appellate court cannot substitute its finding for that of the trial court when there is substantial evidence in support of the verdict. (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]; *Estate of Clark,* 55 Cal.App. 2d 85, 88 [129 P.2d 969]; *In re Chamberlain's Estate,* 44 Cal. App.2d 193, 198 [112 P.2d 53, 934]; *Estate of Pessagno,* 392.) Merely because contradictory inferences can be drawn from the evidence the reviewing court is not at liberty to substitute findings contrary to those of the jury. (*Poe* v. *Lawrence,* 60 Cal.App.2d 125, 131 [140 P.2d 136].) Two physicians, three neighbors, one workman, one client and one lawyer testified to decedent's acts and they opined that such behavior evidenced his general incompetency. The tenor of all the evi-

dence warrants the finding that decedent labored under an insane delusion.

■ Appellant assigns as prejudicial error the court's rulings in admitting 26 exhibits offered by respondent. In the main they consist of letters written by decedent, some of which have been quoted above. The general objection only was lodged against the majority of such documents. To others was added the objection of remoteness. Whether a letter written by a person whose incompetency on a certain date is under investigation is too remote is a question largely addressed to the discretion of the trial court. The letters of decedent herein written in May, June and July, 1944, were especially applicable on the issue of general mental degeneration. Also they indicated that the dark shadow of an imaginary wrong continued to perplex the mind of decedent. His letter of September 22, 1937, was an appropriate index to his intellectual clarity and to the sum total of his desires before disease had undermined him.

■ Criticism is made of the court's overruling the objections to the hypothetical questions propounded to the physicians called by respondent "because they did not contain evidence of the defense." When such witnesses testified appellant had not begun to introduce her proof. If she was dissatisfied with the question because her proof was not included in the hypothetical question she could, on cross-examination, have amended the question to present the picture of the testator as her evidence would paint it. No prejudicial error appears in any ruling upon the admissibility of evidence.

■ The order of the court below in admitting the holographic will of decedent was not erroneous. The instrument reads as follows:

"March 17/27

"This is to certify that my Wife is not to blame in any way for what I am about to do. All of my Earthly possessions are to go to Nettie. I want my body cremated. Please do not notify my folks for at least 2 weeks.

O. I. Halbert"

It answers the legal requirements of a valid will. It directs the disposition of his body and of his estate and was to operate in event of and by reason of his death. (*Nichols* v. *Emery,* 109 Cal. 323, 329 [41 P. 1089, 50 Am.St.Rep. 43].) It was not a gift *causa mortis.* (See Civ. Code, § 1149.) Nothing was delivered by him to respondent at the time. When the

document was written his thoughts were directed to events after death. The suggestion that there was another ''Nettie'' in Tujunga to whom he might have had reference is too far-fetched to require serious consideration.

The judgment in both proceedings are affirmed.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied July 22, 1947, and appellant's petition for a hearing by the Supreme Court was denied August 28, 1947.