[L. A. No. 19208. In Bank. Mar. 30, 1945.]

PACIFIC FREIGHT LINES (a Corporation) et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION, MYRTLE J. OATES et al., Respondents.

Crider, Runkle & Tilson, Clarence B. Runkle and John J. Haydon for Petitioners.

Everett A. Corten and R. C. McKellips for Respondents.

SPENCE, J.—Petitioners seek the annulment of an award made by the Industrial Accident Commission for the death of William Graham Oates. They contend that the commission was without jurisdiction to make the award for the reason that the uncontradicted and unimpeached evidence compelled a finding that the fatal accident was caused by the intoxication

of Oates. Under section 3600(d) of the Labor Code, liability for compensation exists "Where the injury is not caused by the intoxication of the injured employee." A review of the entire record sustains petitioners' contention that they maintained their burden of proof on this affirmative defense (Lab. Code, § 5705(b)) and that an award of compensation was therefore improper.

Before discussing the evidence relating to the cause of the fatal accident, the following facts should be stated: The deceased William Graham Oates was employed by Pacific Freight Lines as a truck driver. On Sunday, April 4, 1943, Oates, as relief driver, was scheduled to take a truck and trailer at El Centro, California, at about 11 p. m. and proceed to Phoenix, Arizona, on a trip which had originated in San Diego, California. Gordon Reynolds, a fellow-employee and truck driver, had a like assignment with respect to another truck and trailer coming from San Diego, except that his ultimate destination was Tucson, Arizona. On the morning of April 4th, the two drivers met at El Monte, California, and proceeded by automobile to El Centro, where they arrived in ample time to assume their driving duties. At the appointed hour they started on their assigned trips with their respective trucks and trailers. They traveled together along the same road and met at various designated stopping places en route until they reached the Phoenix-Tucson highway junction about four miles east of Gila Bend, Arizona, where they were scheduled to go their separate ways to their respective destinations. Reynolds had gone only a few miles beyond the highway junction along the road to Tucson when he was overtaken by Oates, who asked for help in placing a call to the office. At that time Oates was driving his truck only, having lost his trailer at the highway junction. Reynolds unhooked his own trailer from his truck, left it at the side of the road, and followed Oates as he backtracked toward the highway junction. On the return trip Oates traveled at a speed between 60 and 65 miles per hour, and Reynolds could not catch him. While Oates was so proceeding across an overpass and without interference from any other traffic whatsoever, he failed to negotiate a slight bend in the road. As a result his truck went through 175 feet of guard-rail, hurtled from the highway, and came to a stop upside down 130 feet or more out into the adjoining field. Oates died almost immediately from the in-

juries sustained. Oates' trailer was found later by Reynolds at the highway junction, its tongue broken, apparently from buckling due to some sudden stop.

At the hearing before the commission, Reynolds described in considerable detail Oates' intoxicated condition and its progressive development from the time he met Oates at El Monte on the morning of April 4th to the time of the accident, which occurred on April 5, 1943, at about 8:25 a. m. It appears that on the road from El Monte to El Centro, Oates commenced drinking beer and whiskey alternately, and continued so to imbibe while passing several hours at the latter place awaiting the appointed hour of departure; and that after starting from El Centro on his assigned trip with his truck and trailer, Oates persisted in his drinking, over Reynolds' objection, along the route and as they met at various stopping places. Reynolds testified that after crossing the Arizona state line and just before reaching their agreed stop at Welton, Oates "went off the road five or six times . . . he was a drunk driver you might say." At Welton, Reynolds tried to persuade Oates to "stop and sleep"; they "had pretty hard, disagreeable words there" because Reynolds "didn't want him to go on" but Oates was determined to proceed. Both men stopped their trucks again about four miles west of Gila Bend; at this point Reynolds said Oates "was pretty fair drunk." Reynolds "left that spot first," drove into Gila Bend and stopped at a restaurant for coffee. While he was sitting there he saw Oates drive down the road—"that truck came off that hill just like a roaring airplane motor; people just running out of there; come near hitting a little girl right down there by the hotel, and he went right on through town. Everybody got out of the way; was scared." Reynolds resumed his trip and did not see Oates again until Oates "caught up" with him some four miles beyond the Phoenix-Tucson highway junction. Oates was driving only his truck, laughed as he said that he had "lost" his trailer, and asked Reynolds to "call the office" for him. Reynolds testified that at that time "his (Oates) eyes looked like, well, just like glaring at you. He wasn't seeing anything, just drunk. . . . He staggered . . . he just seemed like he didn't know what he was saying . . . he was drunk, and he was past drunk, drinking that hot beer and hot whiskey; the man was absolutely out of his head, that's all that [there] is to it."

Riding with Oates in the truck was a hitchhiker, who, however, did no talking because "he was too drunk to; he was out." It was on the return trip toward the Phoenix-Tucson highway junction that Oates' truck ran off the road, as above described. Oates was killed and the hitchhiker was seriously injured.

Reynolds had the opportunity to observe the inception and development of Oates' intoxication by reason of their close association during the two days of travel here in question. His testimony not only stands uncontradicted and unimpeached in the record, but its credibility is emphasized by the statement of Virgil Elmore, Pacific Freight Lines' driver of Oates' truck on the preliminary trip from San Diego to El Centro on April 4th, that when he "turned over" the truck to Oates at the Pacific Freight Lines' Terminal at El Centro, he detected "the odor of alcoholic liquor on his (Oates) breath"; that "you could tell he'd been drinking."

The commission concedes that "the evidence establishes that the employee was intoxicated at the time of the injury," but in support of its finding that "the evidence does not establish that said injury was caused by the intoxication of the employee," the commission claims that the evidence as to the cause of the injury is conflicting. In support of this position it relies solely upon the following statement in the Arizona death certificate in this matter: "Immediate Cause of Death. Coroner's Jury Verdict—The truck he was driving left the road while on a curve. *Evidence shows that right rear wheel locked due to some mechanical defect.*" (Italics added.) Objection was unsuccessfully made to the admission of this certificate on the ground that it was hearsay, not binding on petitioners and immaterial insofar as establishing the fact of death was concerned, as that had been stipulated. Thereafter the complete transcript of the testimony taken at the coroner's inquest in Arizona was introduced before the commission (*County of Los Angeles* v. *Industrial Acc. Com.*, 123 Cal.App. 12, 15 [11 P.2d 434]) to show that the coroner's jury verdict was totally lacking in evidentiary support. An analysis of this point of challenge to the propriety of the commission's finding and consequent award shows it to be well taken.

■ Assuming the admissibility of the death certificate and that it constituted "prima facie evidence of the facts therein stated" (Arizona Revised Code, 1928, § 2740), it was

subject to rebuttal and to explanation. (*Estate of Scott,* 55 Cal.App.2d 780, 782-783 [131 P.2d 613].) On its face the certificate purported to state nothing as to the cause of the accident except the opinion or conclusion of the coroner's jury. Such opinion or conclusion had no foundation in fact when correlated with the transcript of the evidence produced at the coroner's inquest. It should be accorded no greater force than opinions or conclusions of a witness or an expert, the sufficiency of which depends upon whether facts or reasons are given in support thereof. (*Eisenmayer* v. *Leonardt,* 148 Cal. 596, 600 [84 P. 43]; *Estate of Chevallier,* 159 Cal. 161, 170 [113 P. 130]; *Estate of Smethurst,* 15 Cal.App.2d 322, 335 [59 P.2d 830]; *Estate of Downey,* 51 Cal.App.2d 275, 284 [124 P.2d 637]; *Estate of Pessagno,* 58 Cal.App.2d 390, 394 [136 P.2d 644]; *Estate of Dupont,* 60 Cal.App.2d 276, 285 [140 P.2d 866].)

The only portion of the testimony at the coroner's inquest which even remotely pertains to the sentence in the coroner's jury verdict reading *"Evidence shows that right rear wheel locked due to some mechanical defect"* is that of M. S. Jameson. By his own account he was not an eyewitness, but he simply rushed to the scene of the accident after he heard the impact "150 feet from" his home as Oates' truck crashed into the guard-rail. When asked "what [in his opinion] caused the accident," Jameson said, "I'd say he was either drunk or asleep *unless the brakes went wrong.* I did notice the two right hand rear tires had been skidded, but there was no sign of skidding on the highway." Such statement was not even an opinion that "the brakes had gone wrong." He eliminated any possible significance that might have attached to his observation that "the two right hand rear tires had been skidded," by adding "there was no sign of skidding on the highway." Thus, Jameson himself was not willing to venture an opinion that "some mechanical defect" had any bearing on the happening of the accident. Moreover, after Oates' truck had hurtled through the guard-rail, it came to rest "upside-down" in an adjoining field and its wheels were sticking "straight up" in the air. Yet neither Jameson nor any other witness at the coroner's inquest testified that he had examined the truck after the accident, had tried to turn its right rear wheel and had found by such experiment that the wheel was locked; nor did any witness testify that he had noted the skidded place on the tires as being

on the bottom of the wheel at the point of road contact in the locked position. In such condition of the record the coroner's jury verdict, based solely upon the above quoted *speculative comment* of Jameson, had no probative force and it could not be converted into substantial evidence by its inclusion in the death certificate.

It should be further noted that it was established by uncontradicted and unimpeached testimony at both the coroner's inquest and the commission's hearing that Oates' truck was in "A-1 shape" when the accident occurred. To summarize the evidence as to the condition of the truck before and after the wreck, the following points appear in the record: the truck had been completely overhauled only a week before the accident; it had worked perfectly under most gruelling conditions between San Diego and El Centro before Oates undertook his trip; as Reynolds approached the scene of the accident, he saw the wheels of the truck spinning as it rested "upside-down" in the field; and without any repairs or adjustments of any kind, the truck was put back on its wheels immediately after the accident and towed to Los Angeles, resting on its rear wheels, all of which revolved freely. This complete picture of the truck's excellent mechanical condition at the time in question would leave the commission no reasonable ground for an inference based solely on the unsupported coroner's jury verdict and contrary to the facts established by clear, positive and direct proof. (*Crouch* v. *Gilmore Oil Co., Ltd.,* 5 Cal.2d 330, 334 [54 P.2d 709].) The principle is well stated in *Moquin* v. *Industrial Acc. Com.,* 33 Cal.App.2d 511, 515-516 [92 P.2d 413] as follows: "Conceding that reviewing courts may not invade the field of the fact-finding body, and that under well settled rules where a conflict in the evidence exists the findings of the triers of fact are conclusive, it is nevertheless equally well settled that the application of the foregoing doctrine is limited to cases *where the conflict is substantial and real, and not fanciful or fictitious.*"

The law under which the commission functions is founded upon sound public policy and with the general objective of compensating the injured employee or his dependents for injuries or death resulting from the ordinary hazards of the employment. But where, as here, the uncontradicted and unimpeached evidence points unerringly to the conclusion that the death was caused solely by the intoxication of the

employee, and there is no substantial evidence in conflict therewith, a finding to the contrary and an award based on such finding are not within the jurisdiction of the commission. (*Eagles Home Assn.* v. *Industrial Acc. Com.*, 140 Cal.App. 646, 648 [35 P.2d 591].) To hold otherwise would nullify the defense of intoxication given under the applicable statute. (Lab. Code, § 3600(d).) Here no "rational view of the evidence" (*North Pacific Steamship Co.* v. *Industrial Acc. Com.*, 174 Cal. 500, 502 [163 P. 910]) supports the challenged finding of the commission.

The award is annulled.

Shenk, J., Edmonds, J., Traynor, J., and Schauer, J., concurred.

CARTER, J.—I dissent. There are several controlling factors in this case which the majority opinion has failed to consider, and which compel a conclusion contrary to that reached in said opinion. *It is conceded that the accident which caused the death of Oates occurred in and arose out of the course of the employment.* When this fact was established the applicants had made out their case. The death certificate and verdict of the coroner's jury showing the cause of death were *not a necessary part of applicants' case,* for they had made out their case once they established that the accident which caused the death of Oates arose out of the employment. The issue as to where the blame for the accident might be lodged was, up to that point, *wholly immaterial,* because negligence of the employer need not be shown and contributory negligence is no defense. The freedom from liability afforded the employer when the employee is intoxicated, and that intoxication is the cause of the accident, is an *affirmative defense. The burden of proving it is squarely placed upon the employer by the workmen's compensation law.* (Lab. Code, § 5705.) Thus, we have a case of the employer coming forward with evidence to establish a defense, the applicants having made out their case. The death certificate must be considered in the light of a rebuttal to the employer's evidence rather than a part of applicants' case. We must therefore examine that defense and the rebuttal thereto to see whether the commission could have disbelieved or disregarded the employer's evidence and found that the *employer did not sustain his burden.* That it could have done so is clear. It is true that Reynolds, the

truck driver who was driving a truck on the same route as Oates, the decedent, testified that between about noon and 4:30 in the afternoon while the two drivers were en route to El Centro to pick up their trucks, Oates had a quart of beer and half a pint of whiskey; that on arrival in El Centro he had more whiskey, but when he arrived at the truck terminal at 10 p. m. he walked all right, and the only evidence of consumption of liquor was that he was "talkative" and had the smell of liquor on his breath. Oates then ate some food. At Yuma, Arizona, Oates had a pint of whiskey but as far as Reynolds' testimony is concerned there was nothing in Oates' conduct to indicate intoxication. He was driving his truck. Later at Welton, Reynolds expressed the opinion that Oates was a "drunk driver," and shortly before the accident, that Oates was drunk. However, it is very pertinent to observe that at the coroner's inquest he was evasive about Oates' intoxication. He testified: "Would you say the driver had had plenty to drink? Ans. I'd say he had a *few*. He had another drink at Tonys where we ate." Moreover, it should be remembered that Reynolds was an employee of Oates' employer and cannot be said to have been unbiased. This court said in *Gray* v. *Southern Pacific Co.*, 23 Cal.2d 632, 637 [145 P.2d 561]: "It must be remembered that practically all of the witnesses were employees of the defendant and thus cannot be said to be disinterested witnesses. . . . The jury could have disbelieved those witnesses." How can it be said under these circumstances that Reynolds was wholly unimpeached and that the commission was absolutely bound to accept his evidence? Further it is to be noted that the question of whether or not a person is intoxicated is entirely a matter of opinion (2 Cal. Jur. 10-Yr. Supp., Automobiles, § 26) and *such evidence is not binding upon the trier of fact. It may be disregarded.* It was said in *Southern Pacific Co.* v. *City of Los Angeles,* 5 Cal.2d 545, 548 [55 P.2d 847]: ". . . opinion evidence [which] is not conclusive either upon the trial court or an appellate court." (See, also, 10 Cal.Jur. 971-2.) In the face of that rule the opinion evidence as to Oates' intoxication was not binding and could have been disregarded by the commission. Hence, it cannot be said that the evidence on the issue of intoxication was beyond question and that the commission was required to give it full credit and sustain the defense based thereon.

In addition to proving intoxication the employer had the burden of proving that *the intoxication was the sole cause of*

*the accident.* The evidence on that subject is of only two kinds, that is, *expressions of opinion,* which, as above shown, were *not binding* on the commission, or an inference that because Oates was intoxicated when the accident occurred, the accident was caused by that intoxication. In the first place, the commission was not *obligated* to draw that inference. "An inference is a deduction which the reason of the jury makes from the facts proved, without an express *direction of law* to that effect." (Italics added.) (Code Civ. Proc., § 1958.) And as expressed in *Blank v. Coffin,* 20 Cal.2d 457, 461 [126 P.2d 868]: "The jury is *not compelled* to draw the inference, however, *even in the absence of contrary evidence and may refuse to do so.* Whether a particular inference can be drawn from certain evidence is a question of law, but whether the inference shall be drawn, in any given case, is a question of fact for the jury." (Emphasis added.) Therefore, in the instant case, the commission was not required as a matter of law to infer that the intoxication caused the accident, at least, unless it is the only reasonable inference. Not being compelled to do so, how can this court say in this case, that it must? It is clear from the record in this case that the inference of intoxication as the sole cause of the accident is not the sole inference that may flow from the evidence. For illustration, at the coroner's inquest, Mr. Bell, who arrived at the scene of the accident immediately after it occurred, testified: "Did you observe anything that could have caused the accident? Ans. I couldn't figure it out, unless he dropped off to sleep." Mr. Jameson, under like circumstances testified: "In your opinion, what caused the accident? Ans. I'd say he was either drunk or asleep unless the brakes went wrong. I did notice the two right hand rear tires had been skidded, but there was no sign of skidding on the highway." The circumstances of the scene of the accident, a down grade with a curve, indicate that the truck may merely have gotten out of control, and that may have occurred without regard to intoxication. The traffic officer who examined the scene of the accident and the truck testified: "In your opinion, what was the cause of the wreck? Ans. Excessive speed." To reach the result arrived at in the majority opinion, it is necessary to say that whenever there is an automobile accident, and the driver has been drinking intoxicating liquor, the sole and inevitable conclusion is that the drinking caused the accident. That is not reasonable.

In addition to the foregoing there is the rule that the death certificate is prima facie evidence of the facts therein stated. That is equivalent to saying that it is presumptive evidence, or that a presumption is raised that the facts therein stated are true. (*People* v. *Fitzgerald,* 14 Cal.App.2d 180 [58 P.2d 718]; *Miller & Lux* v. *Secara,* 193 Cal. 755 [227 P. 171]) and as stated in *People* v. *Fitzgerald, supra,* 193: "It is the rule in this state that against a proved fact, or a fact admitted, a disputable presumption has no weight, but where it is undertaken to prove the fact against the presumption, *it still remains with the jury to say whether or not the fact has been proven; and, if they are not satisfied with the proof offered in its support, they are at liberty to accept the evidence of the presumption.*" (*Smellie* v. *Southern Pacific Co.,* 212 Cal. 540 [299 P. 529].) (Emphasis added.) The application of that rule to the facts of the instant case compels the conclusion that the commission's finding is supported. No reason has been advanced why the above rule is not applicable, and I am sure none exists. .

If the majority opinion is correct, then the just claim of an applicant can be defeated by the perjury of a fellow employee who gives false testimony favorable to his employer to save his job or obtain some other perquisite, even though such testimony is disbelieved by the commission, the trier of fact, which is the sole judge of the credibility of witnesses. Such result should not be permitted in a civil action where contributory negligence is a defense, much less in a proceeding under the Workmen's Compensation Act, where such defense is not available, and the burden shifts to the employer whenever it is established, as it was in the instant case, that the accidental death occurred during the course of employment. In my opinion the award should be affirmed.