S. ROSENBLOOM, INC., ET AL. *v.* WILLINGHAM

[No. 163, October Term, 1947.]

*Decided May 20, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, and HENDERSON, JJ., and BAILEY, Circuit Judge, specially assigned.

*W. Hamilton Whiteford,* with whom were *Due, Nickerson & Whiteford* on the brief, for the appellants.

*Daniel S. Sullivan, Jr.,* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

Charles H. Willingham was killed on March 7, 1947, while in the employ of S. Rosenbloom, Inc. as an industrial engineer. In connection with his work, he used a Company car to visit plants of his employer in Cambridge, Salisbury and Crisfield, Maryland, and at Laurel, Delaware, to make "time studies". His home was in Baltimore, where the main office of his employer was located. He was married, having a wife and two grown children. His wife and several other witnesses described him as a man who was not a drinking man, but one who would take "an occasional drink—a sociable drink." During twenty years of married life, she had never seen him intoxicated. He was also described as a

good husband and father, with no domestic or financial difficulties. His wife received a cheerful letter from him a few days before his death. On Friday, March 7, 1947, he left the Crisfield plant, where he had worked that week, and drove to Laurel, Delaware, a distance of fifty miles. There he had lunch with Mr. Nott, superintendent, who testified that they had nothing to drink but discussed business and made plans for the next week's work. He did not notice anything unusual in Willingham's appearance, conversation or actions. Willingham left about 3:15 P. M., perfectly sober, to catch the Matapeake Ferry en route to his home in Baltimore, where he invariably spent his weekends, even when working out of town. The distance from Laurel to Matapeake is 63 miles. At six o'clock, Willingham drove his car on the Matapeake Ferry for the crossing to Sandy Point.

Howard M. Higgins, a deck hand on the ferry, testified that Willingham had difficulty parking his car, and when he got out, he staggered slightly, but made his way to the saloon deck. The witness next saw Mr. Willingham as the ferry was coming into Sandy Point terminal, and noticed that he was then staggering more than ever, that he came down the wrong stairway, and had to go around the boat to reach his car. The witness asked him if he wanted him to drive the car off the ferry for him. Willingham's voice was not very clear and Higgins smelled alcohol faintly. Higgins got in the car, with Willingham beside him, drove off and parked it about 75 feet beyond the ferry slip, facing in the direction of Baltimore. Willingham told Higgins he was going home. Higgins left the engine running, brake on, and Willingham seated on the right side of the front seat. Higgins did not notice the car any more; he returned to the ferry, which pulled out in about ten minutes.

The witness John Higgins, also a deck hand on the ferry, testified that when Willingham drove on the ferry at Matapeake, he nearly ran him down. "He seemed to be staring straight ahead, like he was sick or some-

thing or had something on his mind. He did not seem to notice he was coming on the ferry."

From the end of the gangplank to the entrance to the runway to the ferry, on the Sandy Point side, is a distance of 60 feet. At the entrance, or shore end of the runway, a 5/8 inch chain is secured when the ferry is not in. The runway is wide enough for two lanes of traffic, but because of a fire the night before, one lane had been closed and obstructed by barrels on this day. From the entrance to the runway to the beginning of the improved roads, there is a large parking area, 206 feet in length, and 150 feet wide, illuminated by arc lights.

N. P. Whittle, a watchman at the ferry slip, testified that he saw a car parked about one hundred feet from the slip headed towards Baltimore, after the ferry pulled out. He paid no particular attention, as cars often wait for ferry passengers. At about 7:25 P. M., or about thirty-five minutes after the ferry had left, he saw a car moving toward the empty slip "at a right good gait". It struck the chain and broke it, covered the sixty feet of the runway, and plunged overboard into the empty slip. It proved to be Willingham's car. The police were called, Willingham was taken from the water and given artificial respiration, but did not revive. The police officer who worked on the decedent testified that he did not detect any odor of alcohol, or find any bottle on his person. The car was also pulled up. A witness testified that among other objects that fell from it was a half-pint bottle of whiskey still containing one drink.

The widow duly claimed and was allowed Workmen's Compensation. The award was affirmed on appeal by the Court sitting as a jury. Two issues were presented to the commission and the trial court: (1) Whether the decedent sustained an accidental injury "arising out of and in the course of" his employment, resulting in his death, and (2) whether his death was due solely to intoxication while on duty. By motion for directed verdict in the trial court, the appellant urged that the decedent's

death was due to his wilful intention, or solely to his intoxication, or that in any event the evidence showed such a deviation from the course of his employment, that the accident cannot be said to have arisen out of it. We shall discuss the latter contention first.

The applicable legal principles were fully discussed in the recent case of *Perdue v. Brittingham*, 186 Md. 393, 47 A. 2d 491, and need not be repeated here. In that case a chauffeur was run down while walking away from his parked truck at a point a quarter of a mile from the place where his truck was parked. It was shown that he had abandoned his truck, in perfect running condition, some three and one-half hours before the accident. We held there was no legally sufficient evidence to support an inference that any need of, or obligation to, his employer placed him at the spot where he was killed. We think the instant case is distinguishable upon the facts. Here the decedent was in the employer's car at the time of his death and had declared his intention to go home only forty-five minutes before his death. If the accident had happened while he was leaving the ferry it is conceded that it would have arisen out of and in the course of his employment. Compare *Heaps v. Cobb*, 185 Md. 372, 383, 45 A. 2d 73, and cases there cited. Since the driver was required by his employment to use the car and ferry, the risk of drowning was a hazard of the employment. Death by drowning was a consequence of his employment even though the immediate cause may have been his own negligence or physical or mental condition. *Perdue v. Brittingham, supra; Krell v. Maryland Drydock Co.*, 184 Md. 428, 41 A. 2d 502; *Baltimore Towage & Lighterage Co. v. Shenton*, 175 Md. 30, 199 A. 806. The evidence permits an inference that the decedent was attempting to go home when he drove into the slip, but was confused as to the direction. The mere fact that the car was headed in the opposite direction at that moment is not sufficient to show a change of intention and departure from the employer's business. Compare *National Truck-*

558

*ing & Storage Co. v. Durkin,* 183 Md. 584, 588, 39 A. 2d 687.

We think the evidence also permits an inference that the death was accidental, *i. e.,* due to a mistake in direction caused by confusion or mental aberration, rather than intentional. It is not necessary for a claimant to prove the exact cause that produced the injury. *Spencer v. Chesapeake Paperboard Co.,* 186 Md. 522, 47 A. 2d 385, 387. Section 14 of Art. 101 denies recovery where the injury "is occasioned by the wilful intention of the injured employee to bring about the injury or death of himself or another, or where the injury results solely from the intoxication of the injured employee while on duty." Section 45 denies recovery for a "self-inflicted injury," or one resulting "solely from * * * intoxication." Section 65 establishes presumptions "in the absence of substantial evidence to the contrary", that injury was "not occasioned by * * * wilful intention" and "did not result solely from * * * intoxication". There was no evidence that would supply any motive for suicide. Compare *Krell v. Maryland Drydock Co., supra.* No one saw the decedent take a drink. His conduct may have been due to alcohol or something else. Even if we should draw the inference that he was intoxicated, we think the evidence falls short of establishing that intoxication was the sole cause of the accident, as required by the statute. Compare *Southern Can Co. v. Sachs,* 149 Md. 562, 131 A. 760, 43 A. L. R. 417; *Baltimore Dry Docks & Shipbuilding Co. v. Webster,* 139 Md. 616, 628, 116 A. 842, and *American Ice Co. v. Fitzhugh,* 128 Md. 382, 97 A. 999, Ann. Cas. 1917D, 33. That intoxication was a contributing cause is not sufficient, it must be the exclusive cause. The action of the decedent was more suggestive of dementia than intoxication. We cannot say that the trial court was clearly wrong in finding that causes other than intoxication played a part in the accident.

The authorities in other states, having statutory language similar to ours, do not seem to be wholly in

accord. See *Elm Springs Canning Co. v. Sullins*, 207 Ark. 257, 180 S. W. 2d. 113; *Reddick v. Grand Union Tea Co.*, 230 Iowa 108, 296 N. W. 800; *Lytle Co. v. Whipple*, 9 Cir., 156 F. 2d 155; and *Pacific Freight Lines v. Industrial Accident Comm.*, 26 Cal. 2d 234, 157 P. 2d 634. They differ, however, not as to the principles involved, but in their application to particular facts, widely different from those in the case at bar.

*Judgment affirmed, with costs.*