[Civ. No. 6321. Fifth Dist. Sept. 21, 1981.]

CHERYL J. SMITH, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, ED SMITH
WELDING et al., Respondents.

COUNSEL

Sims, Solomon & Konnoff and Michael S. Konnoff for Petitioner.

Emerson & Yrulegui and Richard J. Yrulegui for Respondents.

OPINION

HANSON (P. D.), J.—Petitioner Cheryl J. Smith, widow of Eddie G. Smith, seeks review of a decision of the Workers' Compensation Appeals Board (WCAB) denying reconsideration of petitioner's claim for death benefits and burial expenses; the decision adopted and incorporated the report of the workers' compensation judge disallowing benefits on the ground that the decedent was intoxicated at the time of the accident and the intoxication was the proximate cause of death.

Eddie G. Smith, employed by Ed Smith Welding of Bakersfield, California, died February 20, 1979, in an automobile accident while returning to his office from a jobsite. On April 3, 1979, petitioner filed an application for death benefits and burial expenses with the WCAB. She

was subsequently appointed guardian ad litem for the Smiths' two children. A hearing was held before the workers' compensation judge, who prepared the following summary of the evidence.

Bobby Burton Morris (Morris) testified that he was employed by Ed Smith Welding and that, on the day of the accident, he began work at the shop at 6:30 a.m. Eddie Smith (Smith) was already there and outlined the work he wanted done. He told Morris to go to Mount Able and to load trucks with clay. Morris left the shop about 7:15 a.m. in a pickup, which had a company radio, and arrived at Mount Able about 8:30 a.m., driving on a curvy, mountainous, blacktop road with a single lane each way. At the mountain, it was raining and snowing off and on; this weather continued all day. Around noon, Morris called Smith on the radio and asked for more trucks.

About 6 p.m., as they were leaving the mountain, a dump truck with a backhoe went around a curve and the backhoe fell off the trailer. Morris called Smith, who asked what equipment was needed and stated that he would come up. Smith arrived at the scene around 8 p.m. and seemed normal to Morris as far as sobriety was concerned; he was properly dressed for the cold.

Smith asked where Morris wanted the equipment, and then hooked slings to the backhoe, which was some 20 feet off and below the road. It was dark; the weather was cold, it was raining, and the soil was muddy. Morris went down to the backhoe with Smith to help hook it up; Morris fell going down the bank, but Smith did not slip nor fall.

They worked for about two hours to right the backhoe; the weather was still rainy, with a mixture of snow, and very cold. Because it was late, they left the backhoe there to be recovered the next day. At the site were the witness' pickup, Smith's pickup, a hydrocrane, two dump trucks, and a trailer. They convoyed out of the area, Smith leading, and Morris bringing up the rear. It was still raining intermittently. Smith left in his pickup and Morris turned the hydrocrane around. Morris then called Smith on the radio and said he was ready. It was raining very hard at that time. Everyone had been told to take the Maricopa Highway to Old River Highway.

As Morris and Smith talked on the radio, they joked; Smith said he was low on gas and not to pass him. Smith's radio went silent. Radio silence can occur on going "into a dead area [in the mountains] where

you are cut out all at once." Smith made no signoff on the radio as was always done. At that time Morris was following the large crane, which had seven red lights. Although Morris was from five to ten feet behind the crane he could not see it because of the rain.

On cross-examination, Morris said there were six vehicles and a trailer coming down the mountain. Smith was probably one-eighth to one-quarter of a mile ahead of Morris as Morris turned the crane around. Smith's pickup was moving as they talked on the radio, but Morris did not know how fast it was traveling, nor how far ahead it was; Morris did not know the weather conditions at Smith's location at the time Smith's radio cut off.

Ron Chambers (Chambers) was sworn and testified that he had known Smith for five or six years, and intimately for the past three years. In 1979, Chambers was off work for back surgery; he managed the Eddie Smith Softball Team. At noon on February 20, 1979, he saw Smith at the ballpark at Sam Lynn Park on North Chester and remained with Smith that day until Smith's death. When the witness met Smith at the park, Smith was waiting for trucks to bring clay from the mountains to be put on the diamond. They made several trips back and forth to the ballpark.

When they first met at noon, each of them drank a can of Coors beer. They then went to a bar in Oildale and had a couple of beers. They went to the shop, and returned to the ballpark. At around 5:30 p.m., they were at the Highland Inn when Smith got a call about an accident on the mountain. They went back to Smith's shop, and Smith called the foreman at the accident site by radio; Smith, Chambers, and another man each drove a truck to the accident site, leaving around 6:30 p.m. and arriving at the scene about 8 or 8:15 p.m.

The road leading to the scene of the accident followed a steady incline. It was raining and getting cold. Smith parked the pickup and gave instructions to Chambers on placing the trucks and using the winch. They were at the scene almost two hours, and then decided to leave the backhoe and come back in the morning to get it. The weather was miserable and cold with a driving rain, almost like sleet. Smith was quite disgusted and upset because it had been a bad day, and the job should have been over at 4 p.m.

While they were there, Smith did not appear to be intoxicated or to have any problems. When they were ready to leave, Smith took off "like a shot from a cannon." The witness tried but could not keep up with Smith, and eventually lost sight of the taillights of Smith's vehicle. It was raining very hard.

Chambers stated on cross-examination that he had intended to ride with Smith but, when they started to leave the accident site, Smith "took off like a shot" down the mountain. Chambers rode as a passenger in an A-frame. The road was curving, winding, and downhill, and it was raining heavily. In the witness' opinion it was not prudent to start that fast.

Chambers explained that he and Smith were at the Highland Inn twice for a total of about two hours. They first went to the Highland Inn around 1 p.m. Smith had a six-pack of Coors beer in his truck, and they each had had one beer. Smith then wanted to use the phone, so they went to the Highland Inn, where each of them had another beer before returning to the shop. The witness did not know what happened to the six-pack. They went back to the Highland Inn, which served lunches, for about one and one-half hours, and Smith had four mixed drinks. When they left the Highland Inn in Smith's truck after the phone call, the four cans of beer were still in the truck.

At the scene of the equipment accident, Smith spent most of his time coordinating the job of righting the backhoe. Chambers could not remember the distance from the backhoe to the bank where the trucks were; however, most of the time they were there, Smith was in Chambers' line of sight and Chambers saw no one drinking.

Chambers testified that he had observed Smith's drinking on a daily basis. Chambers himself drank about four cans of beer every day, and on a "good night," twelve cans. He did not consider himself an alcoholic. Smith sometimes drank mixed drinks, but the witness did not consider Smith to be an alcoholic or to have a drinking problem. The night before the accident, Smith was drinking and playing pool with his friends. It was not unusual for Smith to drink quite a bit, but, in Chambers' opinion, Smith did not drink to excess.

Jude Roger Hayes, M.D., a forensic pathologist in Tulare, was sworn and testified that he had been in private practice two years. He was engaged by Emerson and Yrulegui to review the coroner's autopsy report

of blood alcohol determination and the California Highway Patrol (CHP) accident report. The blood alcohol sample was taken at 11 a.m. on February 21, 1979, the morning following the accident. In Dr. Hayes' opinion, the handling of the specimen was proper. It showed a blood alcohol content of .25 percent.

When asked a hypothetical question as to the cause of death of a 36-year-old white male, 5 feet, 8 inches tall, weighing 180 pounds, who arose before 6:30 a.m. on the date of death, and who at noon at a ball-park consumed 1 beer and was at a bar for 1 1/2 hours consuming approximately 4 mixed drinks, and at 5:30 to 6 p.m. received a call that a piece of his equipment was stuck in the mud in the foothills, and who drove to the scene and was physically active there (if alcohol were consumed by him between leaving the Highland Inn and the time of death it was unknown), and who around 10 to 11 p.m., "took off" down the mountain "like a shot," Dr. Hayes answered that in his opinion death was caused by the traumatic injuries received.

Asked about the effect of the specified blood alcohol content on physical condition, Dr. Hayes stated that in his opinion Eddie Smith would have been under the influence of alcohol and his driving ability would have been impaired. With a blood alcohol level of .25 percent, the man would be "obviously clinically drunk" to an observer, if he were not a regular consumer of several alcoholic drinks per day. An individual who has a .25 percent alcohol level and no alcohol tolerance would have a slurring of speech, an unsteady gait, sleepiness, and signs of unconsciousness. A person who consumes large amounts of alcohol might show no outward signs of intoxication, but nevertheless his driving ability would be impaired at a blood alcohol level of .25 percent because he would have a prolongation of reaction time. Dr. Hayes also said that, although some individuals attempt to compensate by driving slowly, the fact that a witness testified that Smith "took off like a shot" could be "consistent." Dr. Hayes could not state a correlation because behavior varies so widely. Considering the .25 percent blood alcohol level and the CHP report, in Dr. Hayes' opinion, the alcohol could have produced severe impairment of the sensory system, slowing of reaction time, and could have contributed to the car going off the road.

The record before the WCAB included the coroner's report and the report of the highway patrol officer which indicate that the accident occurred at approximately 11:30 p.m. The victim "failed to negotiate a curve" and left the western edge of the roadway while traveling north

on Cerro Noreste Road, a winding road in mountainous terrain. The highway patrol report states that the location of the accident was one mile north of the area where Smith and the crew had been working. No skidmarks were visible prior to the point where the vehicle left the road; there were approximately 30 feet of tire marks on the dirt shoulder. The pickup went down a 15-foot bank, through a barbed-wire fence and rolled over, ejecting Smith. The truck came to rest on its wheels on top of the victim, about 50 feet west of the western edge of the road. The road is paved, with 1 lane approximately 12 feet wide in each direction; the dirt shoulders are 8 feet wide.

Although an injury or death arising out of employment is not compensable if caused by the employee's intoxication (Lab. Code, § 3600),[1] Labor Code section 5705 expressly makes intoxication an affirmative defense and places the burden of proof upon the employer: "The burden of proof rests upon the party holding the affirmative of the issue. The following are affirmative defenses, and the burden of proof rests upon the employer to establish them:

". . . . . . . . . . . . . .

"(b) Intoxication of an employee causing his injury."

In considering what degree of causation must be shown by the California employer to meet the burden of proof necessary to establish an intoxication defense, we find that the decisions of the board and of the courts seem to apply conflicting standards.

Petitioner argues that the proper standard to establish the defense requires an employer to prove that intoxication was the *sole proximate cause* of an accident, contending that the proof must show that intoxication proximately caused the injury, and there were no other possible

---

[1]Labor Code section 3600 provides in part: "Liability for the compensation provided by this division, in lieu of any other liability whatsoever to any person except as provided in Section 3706, shall, without regard to negligence, exist against an employer for any injury sustained by his employees arising out of and in the course of the employment and for the death of any employee if the injury proximately causes death, in those cases where the following conditions of compensation concur: [¶] (a) Where, at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division. [¶] (b) Where, at the time of the injury, the employee is performing service growing out of and incidental to his employment and is acting within the course of his employment. [¶] (c) Where the injury is proximately caused by the employment, either with or without negligence. [¶] (d) *Where the injury is not caused by the intoxication of the injured employee.*" (Italics added.)

causes. Respondent argues that, under California's statute and cases, the employer need show only that intoxication was a *major or primary cause* of an injury. (See Cal. Workmen's Compensation Practice (Cont.Ed.Bar 1973) § 8.12, p. 247; 1-A Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1981) § 17.03[7], pp. 17.30-17.31, and vol. 2, § 10.02[2], pp. 10.7-10.8.)

A good discussion of the problem is provided in Larson, *Intoxication as a Defense in Workmen's Compensation* (1974) 59 Cornell L. Rev. 398 (hereafter cited as Larson). Professor Larson points out that workers' compensation statutes providing a defense of intoxication have taken three general approaches regarding degree of causation. Some statutes provide that once intoxication is shown, the defense is established without any requirement of causation. At the other end of the spectrum are those states, such as New York, in which the statutes require that intoxication be the sole cause of the injury. The majority of states, however, have adopted language similar to California's Labor Code sections 3600 and 5705, providing that the employer must prove that the injury or death was "caused by" or "due to," or "resulting from" intoxication. "The intermediate group of statutes, which look for something resembling ordinary legal causation, have been strictly construed. When a statute says merely 'caused by' or 'due to,' this can refer neither to remote cause nor to sole cause. It must mean proximate cause. When, in addition to the intoxication, the facts have presented a special source of hazard bearing upon the accident, courts have frequently held that the intoxication was not the proximate cause." (Larson, *supra*, at pp. 407, 408.) Because of the absence of any language in sections 3600 or 5705 indicating otherwise, the Legislature must have intended the ordinary tort formula of causation to apply to the employer's burden of proving that intoxication caused an injury.

Proximate cause and legal cause do not mean exclusive cause. The current edition of BAJI defines proximate cause as "a cause which, in natural and continuous sequence, produces the injury, and without which the injury would not have occurred." (BAJI No. 3.75.) The alternative instruction, a definition of legal cause from the Restatement Second of Torts section 431, provides: "A legal cause of an injury is a cause which is a substantial factor in bringing about the injury." (BAJI No. 3.76.) The concept is explained in Prosser, Handbook of the Law of Torts (4th ed. 1971) section 41, at page 240: "[A person's] conduct is a cause of the event if it was a material element and a substantial factor in bringing it about. Whether it was such a substantial factor is for the

jury to determine, unless the issue is so clear that reasonable men could not differ."

Published California court decisions do not fully explain what *kind* of causation is required to prove the defense of intoxication. However, the *results* reached in the cases indicate that the courts interpret the statutes as requiring that intoxication must be shown to be a proximate cause or substantial factor in causing injury, but not necessarily the sole cause.

While the opinion in *Douglas Aircraft, Inc.* v. *Ind. Acc. Com.* (1957) 47 Cal.2d 903, 906-907 [306 P.2d 425], (disapproved on another ground in *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 636 [83 Cal.Rptr. 208, 463 P.2d 432]) speaks of "the proximate cause" of the accident, in that case the court simply upheld the determination of the commission, based on conflicting evidence, that the employee's intoxication was not a substantial factor in the accident. In *Pacific Freight Lines* v. *Ind. Acc. Com.* (1945) 26 Cal.2d 234, 240-241 [157 P.2d 634], the commission's award of death benefits was annulled by the California Supreme Court which held that the evidence showed without substantial conflict that the death was caused "soley" by intoxication. However, the court was not delineating the degree of causation required to establish the defense, but was relying on the lack of conflicting evidence as a basis to overturn the decision. Justice Carter dissented, stating: "In addition to proving intoxication the employer had the burden of proving that *the intoxication was the sole cause of the accident.* The evidence on that subject is of only two kinds, that is, *expressions of opinion*, which, as above shown, were *not binding* on the commission, or an inference that because Oates was intoxicated when the accident occurred, the accident was caused by that intoxication. . . . [T]he commission was not *obligated* to draw that inference." (*Id.*, at pp. 242-243; italics in original.) We find no appellate majority holding in California reiterating Justice Carter's statement that, to provide an affirmative defense, intoxication must be the sole cause of an accident.

In *Eagles Home Assn.* v. *Indus. Acc. Com.* (1934) 140 Cal.App. 646, 648 [35 P.2d 591], the court annulled an award on the ground that there was "direct, creditable and uncontradicted evidence that the deceased was intoxicated when he came to his death, that such intoxication was the primary cause thereof and no competent evidence [was] in conflict therewith, . . ."

Petitioner cites two recent decisions awarding benefits which suggest that the employer must show that intoxication was the sole proximate cause of death in order to prevail on the defense. (*Anderson, Clayton & Company* v. *Workers' Comp. Appeals Bd.* (1981) 46 Cal.Comp.Cases 41; *Del Rey Farms* v. *Workers' Comp. Appeals Bd.* (1980) 45 Cal. Comp.Cases 938.) Although the WCAB denied reconsideration, and petitions for writ of review were peremptorily denied by this court, we disagree with the language in the case summaries purporting to apply a "sole proximate cause" standard. We note that in each case, the facts recited support a reasonable inference that intoxication was not a proximate cause of the death.

Petitioner also relies on the rule of *Clemmens* v. *Workmen's Comp. App. Bd.* (1968) 261 Cal.App.2d 1 [68 Cal.Rptr. 804], that where an employee is discovered dead at or near his job under circumstances which do not explain the death, a presumption or inference arises that the death is work-related. The *Clemmens* rule does not aid review in the present case because the board drew inferences from known evidence and made a factual finding that the death was caused by decedent's intoxication. Our question is whether the finding is supported by substantial evidence in light of the entire record. (Lab. Code, § 5952; *LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 637.)

██ ██ We conclude that the California employer is required to establish that intoxication is a proximate cause or substantial factor in bringing about an accident resulting in death, and further, that this record supports the board's determination that such causation was shown. Causation is a question of fact unless the issue is so clear that reasonable minds could not differ. (See Prosser, *op. cit. supra,* at p. 240; see also, *Industrial Indem. Co.* v. *Ind. Acc. Com.* (1952) 108 Cal.App.2d 632, 637 [239 P.2d 477] and *International Cementers, Inc.* v. *Industrial Acc. Com.* (1950) 15 Cal.Comp.Cases 33, in which there were conflicting inferences and evidence regarding both intoxication and cause of the accidents.)

There is conflicting evidence in the record regarding intoxication. Petitioner cites uncontradicted testimony of witnesses that Smith drove up to the mountain, spent nearly two hours outside in very cold, wet conditions, supervising and assisting in efforts to retrieve the backhoe. He appeared sober to his coworkers and functioned normally. He went down the muddy, slippery bank, without difficulty, to put slings on the

backhoe, whereas Morris slipped going down. No one was drinking at the site. Such evidence indicates Smith was not intoxicated.

However, other evidence supports the conclusion of intoxication. The coroner's report states that Smith's blood contained .25 percent by weight of alcohol. Dr. Hayes testified that *anyone*, whether he had tolerance to alcohol or not, would be intoxicated at this high blood alcohol level, and that, at such a blood alcohol level, a person would have impaired judgment, impaired sensory perception, and slowed reaction time. Although the results of blood tests are not conclusive and must be weighed with all other evidence (*Pacific Employers Insurance Co. v. Workmen's Comp. Appeals Bd.* (1966) 31 Cal.Comp.Cases 214, 216), based on the conflicting evidence, the board's finding that decedent was intoxicated is clearly supported by substantial evidence.

We are aware that a finding of intoxication does not establish that intoxication caused the accident (see *Douglas Aircraft, Inc. v. Ind. Acc. Com., supra*, 47 Cal.2d 903, 906; *Industrial Indemnity Co. v. Ind. Acc. Com., supra*, 108 Cal.App.2d 632) and that the record shows other factors (such as fatigue, wet road, poor visibility because of weather) which may have contributed to the accident. ■ However, "[t]he findings of the [Industrial Accident Commission] will not be disturbed . . . where they are supported by substantial evidence, *or by inferences which may fairly be drawn from the evidence.*" (*Phoenix Indem. Co. v. Ind. Acc. Com.* (1948) 31 Cal.2d 856, 859 [193 P.2d 745]; italics added. See also *Judson Steel Corp. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 664 [150 Cal.Rptr. 250, 586 P.2d 564].) Substantial evidence is "'such relevant evidence as a reasonable man might accept as adequate to support a conclusion.' (*Estate of Teed* [1952] 112 Cal. App.2d 638, 644 . . . .") (*Spurrell v. Spurrell* (1962) 205 Cal.App.2d 786, 791 [23 Cal.Rptr. 414]; *Dyer v. Knue* (1960) 186 Cal.App.2d 348, 351 [8 Cal.Rptr. 753].)

■ Once the board found, on ample evidence, that decedent was intoxicated, the testimony of Dr. Hayes that anyone's judgment and reaction time would be impaired seriously at that blood alcohol level provides the basis for an inference that such impairment was a substantial factor in bringing about the accident. We cannot say such an inference is unreasonable. The existence of numerous circumstances that would support other, conflicting inferences is not a basis for overturning the decision. (*Cal. Shipbuilding Corp. v. Ind. Acc. Com.* (1946)

27 Cal.2d 536, 541-542 [165 P.2d 669]; *Riskin* v. *Ind. Acc. Com.* (1943) 23 Cal.2d 248, 254 [144 P.2d 16].)

The decision of the board is affirmed.

Franson, Acting P. J., and Pettitt, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.